NORTH AMERICAN RAYON CORPORA-
TION, formerly known as North Ameri-
can Holding Corporation, NARCO, Peti-
tioner–Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–
Appellee.

No. 93–1114.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 8, 1993.

Decided Dec. 21, 1993.

Rehearing and Suggestion for Rehearing
En Banc Denied Feb. 3, 1994.

584

H. Wynne James, III (briefed and argued), Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Nashville, TN, for petitioner-appellant.

Gary R. Allen, Acting Chief (briefed), Jonathan S. Cohen (argued), Ann Belanger Durney, Sally Schornstheimer, U.S. Dept. of Justice Appellate Section, Tax Div., Washington, DC, for respondent-appellee.

Before: MILBURN and BATCHELDER, Circuit Judges; and JOINER, Senior District Judge.*

MILBURN, Circuit Judge.

Petitioner North American Rayon Corporation ("North American") appeals the tax court's determination of deficiencies in income tax due from petitioner. On appeal, the issue is whether the tax court erred in holding that in determining taxpayer's basis for depreciation of assets purchased under an asset sale agreement, taxpayer is bound by the allocation of the purchase price set forth in the asset sale agreement. For the reasons that follow, we affirm.

---

* The Honorable Charles W. Joiner, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

## I.

Beaunit Corporation operated a textile and fiber business. In 1978, Beaunit decided to liquidate its five or six operating divisions because it determined that it would be difficult to make a profit as a textile company. Although it sold or closed its polyester and nylon plants and three of its four rayon plants, Beaunit was unable to find another company interested in buying its remaining textile plant, a rayon manufacturing facility in Elizabethton, Tennessee, even though Beaunit offered to sell this plant for the amount of its liabilities. Beaunit then decided to create a corporation to purchase the Elizabethton facility. Petitioner North American was organized as a New York corporation in contemplation of purchasing the Elizabethton facility from Beaunit and Beaunit's wholly-owned subsidiary, Carter County Fibers, Inc.[1] On October 30, 1978, petitioner executed an asset sale agreement with Beaunit and Carter County Fibers, by which it purchased the fixed assets and inventory of the Elizabethton facility.

At the time of the sale, petitioner and Beaunit were controlled essentially by the same individuals and were represented by the same law and accounting firms. The controlling stockholders of Beaunit were Roger White, Grant Wilson, Steve Timko, and Robert E. Smith. The principal stockholders of petitioner were White, Wilson, Timko, and Smith, each of whom controlled 12.75 percent of petitioner's common stock, and James Walker, a minority stockholder of Beaunit and president of its yarn division, who owned 24 percent of petitioner's common stock. Also receiving an ownership interest in petitioner were Charles Boulton, whom Smith solicited to become a stockholder in order to ensure that the sale would not be treated as a reorganization and that the loss realized by Beaunit on the sale would be recognized; Walter Heller & Company, a creditor of Beaunit, which received its interest in return for an early termination of its

factoring agreement with Beaunit; and BVA Credit Corporation, which received its interest as an inducement to loan money to petitioner.

At the time of the asset sale to petitioner, Beaunit's directors were White, Timko, and Smith. White was Beaunit's president. The initial directors of petitioner were White, Timko, Smith, Wilson, Walker, and Boulton. Walker, who under Beaunit had management responsibility for the Elizabethton facility, became president of petitioner.

Under the terms of the asset sale agreement, the purchase price for the fixed assets was stated as $1,000,000, and the purchase price for the inventory was to be calculated by a formula provided in the agreement. The tax court found that

> [i]t is unclear on this record how the total sale price was determined, or who in fact made the allocation of the sale price between inventory and the other assets in the Agreement. Petitioner's shareholders who were involved at the time of the transaction all were aware of the aggregate sale price, but there were no arm's-length negotiations between petitioner and Beaunit with respect to either the sale price or its allocation. It seems probable that the allocation was determined either by petitioner's and Beaunit's New York attorney or by their accountants.

J.A. 33.

A deduction is allowed for depreciation of property used in a trade or business. 26 U.S.C. § 167(a). The property's basis for depreciation is the cost of the property. 26 U.S.C. §§ 167(c), 1011(a), and 1012. On its income tax return for the taxable year ending September 30, 1979, petitioner did not use $1,000,000 as the fixed assets' basis for depreciation. Instead, petitioner allocated the total purchase price ($5,248,934.85)[2] between the fixed assets and inventory accord-

---

1. Carter County Fibers, Inc. was formed to hold raw material inventory for Beaunit's operations. In November 1978, Carter County Fibers, Inc. was merged into Beaunit.

2. This amount reflected the stated price for the fixed assets ($1,000,000) plus the amount calculated under the inventory price formula ($4,064,127) plus acquisition costs that petitioner capitalized ($184,807).

ing to their relative values.[3] Using this method, petitioner assigned $4,897,256.22 as the fixed assets' basis for depreciation. Petitioner's subsequent tax returns have been consistent with this allocation. However, Beaunit's allocation of purchase price on its tax return was consistent with the asset sale agreement.

On January 31, 1989, the Commissioner issued petitioner a notice of deficiency for the years 1980, 1982, 1984, and 1985 with respect to its depreciation deductions. On April 18, 1989, petitioner filed a petition in the tax court seeking a redetermination of the asserted deficiencies. At the trial, petitioner presented evidence that the agreement's price allocation was disproportionate to economic value and argued that it should be able to reallocate the purchase price to reflect economic reality. The Commissioner argued that petitioner was bound by the prices set forth in the asset sales agreement under the *Danielson* rule, which provides that "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir.) (en banc), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). Petitioner introduced testimony regarding the commonality of shareholders and directors between petitioner and Beaunit at the time of the sale and argued that even under the *Danielson* rule, it was not bound by the agreement because it was the product of undue influence by Beaunit over petitioner.

On May 8, 1992, a tax court judge wrote a letter to counsel for the parties indicating that the tax court was inclined to rule in favor of petitioner.[4] However, on October 14, 1992, the tax court filed a memorandum findings of fact and opinion finding that there was no evidence of undue influence and holding that under the *Danielson* rule, petitioner is bound by the allocations set forth in the asset sale agreement. On November 12, 1992, petitioner moved for review of the opinion and for reconsideration. The tax court denied both motions. An agreed computation was entered, and on December 16, 1992, the tax court entered its decision in favor of the Commissioner ordering deficiencies in income tax due from petitioner.[5] This timely appeal followed.

## II.

Petitioner argues that the *Danielson* rule is inapplicable to this case and, alternatively, that if the *Danielson* rule is applicable to this case, it does not bind petitioner to the price allocation in the asset sale agreement because the allocation was the result of undue influence by Beaunit. The tax court held that the record was devoid of any evidence of undue influence and that, in accordance with the *Danielson* rule, petitioner was bound by the allocation set forth in the agreement. A Court of Appeals reviews the tax court's findings of fact only for clear error and its findings of law de novo. *E.g., Smith v. Commissioner*, 926 F.2d 1470, 1474 (6th Cir. 1991). The tax court's finding that the *Danielson* rule applied to this case was a finding

---

3. Petitioner used appraisals which estimated the value of fixed assets at approximately $73 million, supplies at $754,000, and inventory at $4.5 million. Taxpayer then allocated the total purchase price by prorating the purchase price among the acquired assets in proportion to these values, resulting in an allocation of the purchase price of $301,141.87 to inventory, $50,536.76 to supplies, and $4,897,256.22 to fixed assets.

4. This letter, which was made a part of the record by order of the tax court, stated in relevant part:

Upon reviewing the record in [this case], the Court has made a determination that the allo-

cation of the purchase price between "Fixed Assets" and "Inventory" as set forth in ... the Asset Sale Agreement ... was not the result of arm's length negotiations; did not reflect economic reality, and is not binding upon petitioner. Consequently, the purchase price must be allocated ... in proportion to the respective fair market values....

J.A. 51.

5. The deficiencies were in the amounts of $421,-462.00 for taxpayer's tax year ending September 30, 1980; $137,413.00 for the year ending September 30, 1982; $218.00 for the year ending September 30, 1984; and $13,792.00 for the year ending September 30, 1985.

of law and, therefore, subject to de novo review by this court.

## A.

The *Danielson* rule provides that "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir.) (en banc), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). *Danielson* involved a stock purchase agreement which allocated $152 per share as the price for the seller's covenant not to compete and $222 per share as the price for the stock. The issue was whether the selling shareholders could ignore the agreement's price allocation and treat the entire purchase price as capital gain from the sale of the stock. The selling shareholders argued that the $152 was, in economic reality, additional consideration for the stock, and therefore the form of the purchase price allocation should not be respected. Although the Third Circuit accepted the tax court's finding that the allocation was totally out of proportion to economic reality, it held that the shareholders were bound by the contract's allocation.

This court adopted the *Danielson* rule in *Schatten v. United States*, 746 F.2d 319, 321–22 (6th Cir.1984) (per curiam). In *Schatten*, a taxpayer argued that payments from her ex-husband should be nontaxable income because in economic reality the payments were for property settlement, even though the divorce settlement agreement specifically stated that she would treat the payments as ordinary income. This court would not allow the taxpayer to go beyond the terms of her unambiguous agreement to "challenge the tax consequences of [the] settlement agreement absent 'proof which in an action between the parties to the agreement would be admissible to alter the construction or to show its unenforceability because of mistake, undue influence, fraud, or duress.'" *Schatten*, 746 F.2d at 321–22 (quoting *Danielson*, 378 F.2d at 775).

The *Danielson* rule serves the purpose of increasing the level of certainty as to the tax consequences of contracts. By allowing the Commissioner to determine tax consequences from the form of a taxpayer's contract, the *Danielson* rule alleviates the litigation burden of the Commissioner. If a party could alter the express terms of his contract by arguing that the terms did not represent economic reality, the Commissioner would be required to litigate the underlying factual circumstances of "countless" agreements. Furthermore, the Commissioner might be required to litigate against both parties to the agreement in order to protect tax revenues. *Schatten*, 746 F.2d at 322; *Danielson*, 378 F.2d at 775. If both parties succeeded in their claims, the Commissioner would lose out on revenue that logically should have come from one of the parties. *Sullivan v. United States*, 618 F.2d 1001, 1004 (3d Cir. 1980). In those situations, the Commissioner is commonly referred to as being "whipsawed." By allowing the Commissioner to hold taxpayers to the terms of their agreements, the *Danielson* rule prevents this "whipsaw" problem. *Spector v. Commissioner*, 641 F.2d 376, 385 (5th Cir. Unit A. Apr.), *cert. denied*, 454 U.S. 868, 102 S.Ct. 334, 70 L.Ed.2d 171 (1981).

Not only does the *Danielson* rule provide certainty to the Commissioner, it also provides a higher level of certainty to the taxpayers by maintaining "the reasonably predictable tax consequences" of agreements. *Danielson*, 378 F.2d at 775. If the other party cannot rely on the agreement to predict tax consequences, then the making of such agreements will be hindered. *Schatten*, 746 F.2d at 322. "By fostering an increased predictability that the parties' contractual allocation will control the tax consequences that will attend such agreements, the *Danielson* rule encourages parties to take such considerations into account when forming their bargain." *Sullivan*, 618 F.2d at 1004–05. Of course, the taxpayers cannot rely merely on the form of their transaction to predict the tax consequences. The Commissioner is not bound by the form and can look through the form of a taxpayer's transaction to its substance in determining the proper

effect for taxation. *E.g., Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). The *Danielson* rule does, however, increase the predictability of tax results by preventing one party to an agreement from unilaterally reforming the agreement for tax purposes.

■ Petitioner argues that allowing it to reallocate the purchase price in conformity with economic reality would not violate the purposes of the *Danielson* rule, because there is no possibility of the Commissioner's being whipsawed, and therefore the *Danielson* rule should not be applied to this case. Petitioner contends that Beaunit and its subsidiaries would have reported a loss of $1,123,665.34 on its 1978 consolidated income tax return regardless of how the price was allocated. Petitioner contends that any increase in the capital gain reported by Beaunit as a separate corporation due to the increased sale price of the fixed assets would be exactly offset by the decrease in taxable income reported by Carter County Fibers as a separate corporation due to the decreased sale price of the inventory. Petitioner argues that because Beaunit would not have paid any taxes in 1978 regardless of how the purchase price was allocated, Beaunit and petitioner do not have adverse tax interests, and therefore the Commissioner could not be whipsawed.

Petitioner's argument misconstrues the importance of the whipsaw danger to the application of the *Danielson* rule. The *Danielson* rule does protect the Commissioner from the potential of being whipsawed, but this potential is not a prerequisite to the application of the rule. Petitioner's argument would require the court to determine the alternative tax consequences in each *Danielson* type case, a result that would violate the need for certainty inherent in the *Danielson* rule. In fact, the First Circuit has properly rejected a similar argument:

> The Commissioner properly points out that for parties to agree on paper one way,

benefitting one of them vis-a-vis himself, and then to permit the other to claim that the agreement was really something different, exposes him to a whipsaw. This danger is one of the purposes of the "strong proof" rule. Nor is that rule to be avoided in some individual case by a showing, (as we understand taxpayer to contend here) that no whipsaw is involved. If certainty is a desirable goal, we would not consider this a desirable exception. Rather, it could only lead to highly complicated debate.

*Harvey Radio Lab., Inc. v. Commissioner*, 470 F.2d 118, 120 (1st Cir.1972).[6]

Petitioner also argues that the *Danielson* rule only applies where the parties to the agreement have independently and mutually bargained for the contractual provision in question. Petitioner draws this conclusion by lifting language from the three Sixth Circuit cases considering the applicability of the *Danielson* rule. In *Schatten*, one of the reasons this court gave for adopting the *Danielson* rule in that case was that "[i]f [the wife] is in effect permitted to alter the tax consequences that she bargained for, then she will have succeeded in unilaterally reforming the agreement to her benefit." *Schatten*, 746 F.2d at 322. In *Patterson v. Commissioner*, 810 F.2d 562, 572 (6th Cir. 1987), this court refused to apply the *Danielson* rule where the contract terms regarding allocation of purchase price to a noncompete covenant were ambiguous because "[t]he *Danielson* rule can only be meaningfully applied in those cases where a specific amount has been mutually allocated to the covenant as expressed in the contract." In *Green v. Commissioner*, 855 F.2d 289, 293 (6th Cir. 1988), this court refused to apply the *Danielson* rule to a divorce decree that labeled payments as a property settlement because "a court-ordered divorce decree is not the result of the kind of bargaining that enters into the negotiation of a settlement agreement," and therefore "the argument that the tax consequences of the award were part of the parties' bargain does not apply."

---

**6.** The "strong proof" rule was also applied by this court before we adopted the *Danielson* rule. The "strong proof" rule requires a party seeking to disregard the express price allocations in an agreement to adduce strong proof that the parties actually intended to attribute different values than those stated in the agreement. *See Montesi v. Commissioner*, 340 F.2d 97, 100 (6th Cir. 1965).

However, those statements do not indicate that whether the parties bargained for the allocation must be considered before the *Danielson* rule becomes applicable to a case. The *Danielson* rule was inapplicable in *Patterson* because the price allocation was ambiguous. In this case, there is no argument about ambiguity. The asset sale agreement states: *"Buyer shall pay $1,000,000 to Beaunit for the sale of the Fixed Assets."* J.A. 101. The *Danielson* rule was inapplicable in *Green* because, unlike this case, there was no contract between the parties but rather a court order directing the property settlement. Thus, the rule to be taken from those cases is that the *Danielson* rule does not apply if there is no contract between the parties or if the contract is ambiguous.

■ Of course, whether the parties bargained for the allocation is not irrelevant to the operation of the *Danielson* rule. Under the *Danielson* rule, the taxpayer can seek to prove that the contract would be unenforceable between the parties. Evidence concerning lack of assent would therefore be relevant. However, simply pointing out that there were no negotiations over the particular price allocations does not show a lack of assent. The *Danielson* court recognized that "the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it." *Danielson,* 378 F.2d at 778 (quoting *Hamlin's Trust v. Commissioner,* 209 F.2d 761, 765 (10th Cir. 1954)).[7]

■ Therefore, if a taxpayer has entered an asset sales contract that unambiguously allocates the purchase price among the subject assets, then the taxpayer can challenge the tax consequences properly flowing from those allocations only by showing that the term would be unenforceable between the parties. Because the allocation of purchase price in the asset sale agreement in this case is unambiguous, the Commissioner can bind petitioner to this allocation unless petitioner can show that the terms of the contract are unenforceable due to mistake, undue influence, fraud, duress, etc. We feel that the *Danielson* rule provides an effective standard for determining the tax consequences of taxpayers' unambiguous sales contracts. The bright-line rule provides certainty to the Commissioner and better enables taxpayers to predict, and plan for, the tax consequences of their contracts.

**B.**

■ Petitioner argues that because the same individuals were controlling stockholders and directors of both Beaunit and petitioner, and two of these stockholder-directors, Wilson and Timko, designed the entire transaction, petitioner was prevented from bargaining at arms-length, and therefore the price allocations were the result of undue influence. The tax court found that "the record [was] devoid of any evidence of ... undue influence." J.A. 34. The tax court's finding that Beaunit did not exercise undue influence over petitioner was a finding of fact and, therefore, will not be reversed unless clearly erroneous. *See Carlen v. Carlen,* 634 F.2d 346, 347 (6th Cir.1980).

■ The asset sale agreement contains a choice-of-law provision making New York law applicable to the contract. Under New York law, undue influence exists where a relationship of control exists between the contracting parties, and the stronger party influences the weaker party in a way that destroys the weaker party's free will and substitutes for it the will of the stronger party. *Kazaras v. Manufacturers Trust Co.,* 164 N.Y.S.2d 211, 220 (N.Y.App.Div.1957), *aff'd,* 4 N.Y.2d 930, 175 N.Y.S.2d 172, 151 N.E.2d 356 (N.Y.1958); *In re Will of Walther,* 188 N.Y.S.2d 168, 172 (N.Y.1959); *see also* Restatement (Second) of Contracts § 177 ("Undue influence is unfair persuasion of a party who is under the domination of the person exercising the persua-

---

7. Petitioner argues that the problem with this contract is not only that there were no negotiations over the price allocation but that it was prevented from bargaining because of the relationship between it and Beaunit. This contention does not make the *Danielson* rule inapplicable from the outset but is a proper consideration concerning the enforceability of the contract, and therefore we consider this contention below in relation to petitioner's argument that the price allocation was a result of Beaunit's undue influence over petitioner.

sion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare.").

■ The price allocation provisions of the asset sale agreement were not the product of undue influence because there was no relationship of domination between Beaunit and petitioner and because Beaunit did not exercise any improper influence over petitioner. Petitioner argues that it was under the control of Beaunit because, as the tax court found, petitioner and Beaunit were controlled essentially by the same individuals. However, the fact that they were controlled by the same individuals can no more mean that Beaunit controlled petitioner than that petitioner controlled Beaunit. The common control actually means that Beaunit and petitioner acted in concert in structuring this transaction, since the controlling individuals created the transaction they desired on behalf of both parties. Accordingly, petitioner cannot cite any authority for the proposition that undue influence was exercised where two commonly-controlled corporations entered into an agreement.[8]

■ Not only is there a lack of a control relationship, where the opportunity for improper influence may exist, Beaunit did not actually exercise any influence over petitioner in allocating the purchase price. A critical element of undue influence is that the stronger party seeks and obtains an advantage. *Kazaras,* 164 N.Y.S.2d at 220, 151 N.E.2d 356. "Disinterested advice, and even pressure, no matter how bad, are not to be confused with undue influence, for undue influence is tantamount to a species of cheating." *Id.* Petitioner argues that the fact that the total sale price was $1,000,000 more than the price for which Beaunit had offered the Elizabethton facility to other purchasers and the fact that another purchaser could have negotiated a better price allocation indicate that Beaunit exercised improper influence over petitioner. Unfairness of the re-

sulting bargain is a factor to take into consideration in determining whether improper influence has been exercised, but this consideration is not controlling. *Spector v. Commissioner,* 641 F.2d 376, 384 (5th Cir. Unit A Apr.), *cert. denied,* 454 U.S. 868, 102 S.Ct. 334, 70 L.Ed.2d 171 (1981); Restatement (Second) of Contracts § 177 cmt. b.

■ Here, there is no evidence of any persuasion whatsoever. No one knows how the price allocations were determined, and, as petitioner points out, the primary consideration concerning the sales price was arriving at a total sales price that would allow petitioner to meet its debt service requirements. Brief of Appellant 26–27. There is no evidence that Beaunit actively sought to allocate the price in a manner that was favorable to Beaunit. The only thing the evidence indicates is that Beaunit and petitioner simply did not consider the tax implications of the price allocations and, therefore, did not negotiate them. A contract provision is not unenforceable simply because the parties did not negotiate the particular provision. *See e.g., Danielson,* 378 F.2d at 778.

Petitioner's argument that this transaction involved an inability to negotiate as opposed to a mere absence of negotiation is not well taken. Petitioner contends that Beaunit's tax liability would have been the same regardless of how the price was allocated. Therefore, Beaunit would not have objected to changing the price allocation. In fact, the decisionmakers of Beaunit would have benefitted by such a change because they were also decisionmakers of petitioner. Thus, it does not seem that these decisionmakers prevented themselves from structuring the price allocation provision in a way more favorable to petitioner, but rather it seems that the decisionmakers just did not think about the importance of how the price was allocated.

We conclude that the tax court's finding that Beaunit did not exercise undue influence over petitioner is not clearly erroneous. Because the *Danielson* rule is applicable to this

---

8. However, in its reply brief, petitioner argues that under New York law a contract is voidable by either party if it is a contract between commonly-controlled corporations. This is a doctrine separate from undue influence. We express

no opinion as to the relation of this corporate law doctrine with the *Danielson* rule because it was raised for the first time in petitioner's reply brief. *See Wright v. Holbrook,* 794 F.2d 1152, 1156–57 (6th Cir.1986).

case, and petitioner has failed to show that the price allocation in the asset sale agreement would be unenforceable between it and Beaunit, the Commissioner can require that petitioner use the price allocated to fixed assets in the asset sale agreement as the fixed assets' basis for depreciation.

### III.

For the reasons stated, the decision of the tax court is **AFFIRMED**.