**HUNTER SAVINGS ASSOCIATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C–1–91–885.**

United States District Court,
S.D. Ohio,
Western Division.

June 26, 1994.

*wealth v. Lousi Trauth Dairy, Inc.*, No. 92–50 *slip op.* (E.D.Ky., June 25, 1992).

**1242**

Daniel Izenson, James Kennedy, Cincinnati, OH, for plaintiff.

Donetta Wiethe, Cincinnati, OH, Stephen Sherman, Dept. of Justice, Tax Div., Washington DC, for defendant.

### FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

CARL B. RUBIN, District Judge.

This matter is before the Court following a bench trial held in April, 1993, and in November, 1993, during which testimony and evidence were presented. The interrupted presentation of evidence was required by a number of extraneous factors including illness of some of the participants.

Plaintiff Hunter Savings Association (Hunter) seeks a determination by the Court that it did not realize a taxable gain from its sales of a portion of the assets of Home State Savings & Loan Association ("Home State") to the First National Bank of Cincinnati ("Star"[1]) and Ameritrust Company National Association ("Ameritrust"). Hunter also seeks a determination that it properly valued the Home State Loan portfolio and that the resulting allocation to its basis in the loan portfolio of a portion of the premium paid to the State of Ohio for Home State was correct and proper. The Internal Revenue Service ("IRS") sent a notice of tax deficiency and interest plus a penalty for substantial underpayment following its examination of Hunter's reporting of these transactions. Hunter paid the Internal Revenue Service and then filed a refund claim. The IRS denied the claim for refund. Hunter then brought this action to recover the monies it paid to the IRS pursuant to the notice of tax deficiency. The United States maintains that the deficiency, interest and penalty were appropriate. In accordance with Rule 52, Fed.R. of Civ.P., the Court does submit herewith its Findings of Fact, Opinion and Conclusions of Law.

### I.

#### Findings of Fact

1. On March 9, 1985, after a run on its deposits, Home State became insolvent and was forced to close by the Superintendent of Savings and Loans for the State of Ohio. The amount owing depositors exceeded the total amount on deposit with an insurance fund known as the Ohio Deposit Guarantee Fund. In addition, the activities of some of the principals in Home State were such that at least three of them served prison sentences. The events of March, 1985, caused sufficient turmoil that the Governor of Ohio intervened, directing the Superintendent of Savings and Loans to find a buyer of Home State's remaining assets.

2. During the Spring of 1985 detailed negotiations were conducted with a number of financial institutions including the Chemical Bank of New York ("Chemical"). On April 2, 1985, Chemical made an offer to purchase Home State. On May 21, 1985, the Ohio Legislature tentatively approved Chemical's bid but gave Ohio institutions seven days to submit a competing bid. Evidence was presented that a local purchaser was preferred. Hunter made the only such bid. On May 28, 1985, the Superintendent of Savings and

[1]. The First National Bank of Cincinnati subsequently changed its name to Star Bank.

Loans accepted Hunter's bid for Home State's remaining assets which included cash, a loan portfolio, and a total of 34 branches located in southwestern and central Ohio. The book value of Home State assets at that time totalled $598 Million Dollars. Hunter assumed liabilities of $618.4 Million Dollars, reflecting at that time a premium of $20.4 Million and infused equity of $51 Million into Home State.

It should be noted that the deposits used by a savings and loan association for investments are regarded as liabilities, while the investments themselves, which may never be paid off, are considered as assets. This problem is further complicated by the fact that at least in institutions which are federally insured, deposits are guaranteed to the amount of $100,000 per account and the traditional investment into real estate mortgages is no longer the predominant investment technique of many institutions.

During the negotiations Hunter entered into agreements with Ameritrust and Star. Those agreements provided for the following:

A. Hunter entered an Agreement on June 6, 1985, with Ameritrust involved the sale of ten branches, an assumption by Ameritrust of $46.7 Million Dollars of liabilities on the books of those branches, and the sale of book assets valued at $43 Million Dollars. In the contract the excess of $3.8 Million in liabilities over the book assets were described as "a premium paid on and for the deposit liabilities assumed."

B. On June 10, 1985, Hunter entered an Agreement with Star involving the sale of ten branches, the assumption by Star of $159 Million Dollars of liabilities on the books of those branches and book assets valued at $147.7 Million Dollars under the contract. The excess of approximately $11.3 Million Dollars in liabilities over the assets was described in the contract in the same language as used with Ameritrust: "A premium paid on and for the deposit liabilities assumed."

C. These transactions closed on June 13, 1985.

3. Hunter retained 14 of the Home State branches with liabilities (deposits) of approximately $317.5 Million Dollars, $119.4 Million of cash and other assets, including the $51 Million it was required by contract to subject to the risks of the venture. It should be pointed out that virtually none of the Home State loan portfolio was purchased by either of the purchasers. It should likewise be pointed out that the liabilities assumed by the purchasing banks were mostly savings deposits in the branches involved and most of the assets acquired were cash equivalents.

4. In reporting these transactions for tax purposes, Hunter attributed $15.1 Million of the $20.4 Million premium paid to the State of Ohio to the branches sold to Star and Ameritrust so that Hunter's basis in the assets sold equalled the consideration received. As a consequence Hunter reported no gain from the asset sales.

5. Hunter and Ohio closed the Home State purchase on June 13, 1985. At that time Hunter adjusted the loan values in Home State's loan portfolio to reflect a decrease in interest rates which occurred between March 31, 1985 when Chemical valued the loan portfolio and June 13, 1985, the closing date. Because there was a decrease in the interest rates, all fixed rate loans increased in value. Additionally, in the time between March 31 and June 13, 1985, payments were made on loans which also changed the valuation of the loan portfolio.

6. On November 26, 1990, the IRS advised the Plaintiff that it had determined a tax deficiency for the 1985 tax year in the amount of $118,082.00, together with a penalty for substantial understatement in the amount of $29,521.00 plus interest of $98,119.31 for a total tax deficiency of $245,722.31 due. The deficiency was paid and a claim for refund was made. That refund claim was denied on September 19, 1991, and this action thereupon commenced.

## II.

### OPINION.

An analysis of the transactions among Hunter, the State of Ohio, Star and Ameritrust must commence with a review of the purchase contract between Hunter and Ohio.

Section 1.1 of the contract provides the formula under which the purchase price was to be computed. That formula was: liabilities + capital = assets + capital + premium; where the premium represented the purchase price to be paid by Hunter. In March of 1985 the assets totaled roughly $598 Million and the liabilities totaled roughly $618 Million. The formula in section 1.1 called for a $21 Million premium, however, the testimony indicates that both Hunter and Ohio acknowledged that the premium might change before closing. Even the Government concedes that the premium at closing was not $21 Million but $20.4 Million.

The contract between Hunter and Ohio is silent with regard to the allocation of premium. In fact, the testimony of the principals involved in this transaction indicate that the State of Ohio was less concerned with how Hunter allocated the premium than the dollar amount it would be responsible for in this transaction. (McAlister Test. Transcript set 2, p. 110–111 and Miller Test., Transcript set 2, p. 174–175.) As the assets and liabilities changed in value, so too would the premium value.

### A. Were Hunter's transactions with Ameritrust and Star concurrent transactions or a purchase and resale?

■ Hunter contends that its transactions with Ameritrust and Star took place concurrently with its transaction with the State of Ohio and that it functioned merely as a conduit for the Home State assets acquired by Ameritrust and Star and thus it recognized no gain on the transfer. The Government, however, contends that the transactions with Ameritrust and Star were resales following Hunter's purchase of Home State and that the IRS properly concluded that this was a purchase-resale and that Hunter recognized a gain on the transaction.

■ It is the general rule that a taxpayer is bound by the form in which it casts a transaction. While Hunter was free to act as the agent of Star and Ameritrust, it chose instead to purchase all branches from the State of Ohio and resell a portion of them to Ameritrust and Star. Consequently, Hunter cannot now argue that it intended for the transaction to take a different form. *See Cottage Savings Association v. Commissioner of Internal Revenue,* 890 F.2d 848 (6th Cir.1989). Therefore, this transaction was a purchase-resale.

### B. What Was Hunter's Basis in the Assets Resold to Ameritrust and Star?

A determination of the proper allocation of Hunter's basis among the Home State assets purchased by it requires that the aggregate purchase price be allocated among the various assets in relation to their fair market values at the time of Hunter's purchase.

It is undisputed that Star and Ameritrust paid Hunter an aggregate premium of $15.1 Million Dollars for the assets that they acquired. Likewise, the parties agree that Hunter paid the State of Ohio at least $20.4 Million Dollars to acquire all of Home State's assets including those assets.

■ Hunter maintains that it did not recognize a gain on its sale of assets to Star and Ameritrust because its tax basis in those assets equalled the consideration it received for them. It argues that the sale of Home State assets to Star and Ameritrust is the best evidence of their fair market value when purchased by Hunter from Ohio. The fair market value of the assets in turn establishes $15.1 Million Dollars as the portion of the premium allocable by Hunter to its basis in these branches.

The United States argues that the premium should have been allocated by Hunter among the branches in proportion to the customer deposits at each branch. Under this allocation, 39% of the premium ($7.9 Million) would have been allocated by Hunter to the branches that Ameritrust and Star purchased, resulting in a gain to Hunter of approximately $7.2 Million Dollars when the branches were resold for $15.1 Million.

The United States' theory of basis allocation focuses mechanically on the amount of deposit liabilities acquired by Star and Ameritrust and disregards the market values placed on these assets by the parties. Such

mechanical analysis of value is appropriate as a means of determining the fair market value of the assets only in the absence of other better evidence.

■ The best evidence of the market value of individual assets is in an allocation of purchase price which is agreed to by purchaser and seller. Unfortunately, the contract between Hunter and Ohio is of no help because it was silent as to the values assigned to each asset. Each party knew that the values would fluctuate and that there would not be a "valuation" of the assets until closing. The evidence also showed that the State of Ohio did not care how Hunter allocated or made its valuations under the contract so long as "the pot was filled" at the end of the day.[2]

As the contract between Hunter and Ohio was silent as to the value of the branches, the next best method for determining what Hunter paid for the intangible assets is what it sold those assets for in a contemporaneous arms length market transaction, which occurred only hours later on June 13, 1985. That was the $15.1 Million aggregate purchase price indisputably paid to Hunter by Ameritrust and Star for those assets on that very date.

The defendant's expert, Mr. Litan, testified to the opposite. However, the actions of the participants in the transaction who had real money at stake outweighs the theoretical analysis of Mr. Litan who was not involved in any fashion in these transactions.

Hunter's tax basis in the intangible assets of the branches it sold to Ameritrust and Star was equal to the premium those two banks paid. Accordingly, Hunter did not recognize a gain on its resale to Ameritrust and Star.

### C. Did Hunter Properly Revalue the Home State Loan Portfolio?

■ Hunter adjusted the loan values in the Home State Loan Portfolio to reflect a decrease in the interest rates between March 31, 1985, when Chemical made its bid and June 13, 1985, the closing date of the deal between Hunter and the State. Hunter asserts that it correctly valued and assigned tax basis to the loans it acquired. The Government contends that the rule of *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir.), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967), precludes Hunter from challenging the asset values set forth in its contracts with the State.

■ The *Danielson* rule, *supra*, provides that "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter the construction or to show its unenforceability because of mistake, undue influence, fraud,

---

2. Testimony of Robert McAlister, Set 2, Vol. 1: Pg. 108, line 5, (Direct)

Mr. McAlister: ... So I had, as I would describe it, this, you know, big vat of liquid, if I could call it that, and to fill it up to the top I had to have enough liquid to make the depositors whole and make the debenture holders whole. Now, what did I pour into the pot? Well, the Ohio Deposit Guarantee Fund ... w[as] forced by the legislature to turn over roughly the $81 million they had left, although they were allowed to keep some money, to pour into the pot. Then we had to pour in the pot Chemical's view of the assets and Hunter's view of the assets, but whatever the assets were, that went in there.

And then we had the State aid component.... Pg. 110, line 6, (Direct)

Mr. Quigley: Did you anticipate that the $21 million premium figure that is identified in the Hunter bid would be fixed or subject to adjustment?

Mr. McAlister: Subject to adjustment. That was the final component that was to go into the pot,

so to speak, was the so-called premium. And I think everyone that was working closely with it understood that nobody really knew what all the numbers were and that it had to be adjusted.

The Court: Do I understand that the total figure that would be paid to the State of Ohio was fixed?

Mr. McAlister: Right.

The Court: But the manner in which it would be allocated was still subject to adjustment?

Mr. McAlister: Yes, sir, that's correct.

The Court: Thank you.

Pg. 133, line 7, (Cross)

The Court: Did you particularly care how the money was allocated as long as you got a certain figure for distribution?

Mr. McAlister: Absolutely not. I wanted the pot filled.

The Court: Your concern was for the depositors and debenture holders, and that is all?

Mr. McAlister: That's it, absolutely, that is all.

duress, etc." *Danielson, supra.* The Sixth Circuit adopted the *Danielson* rule in *Schatten v. United States,* 746 F.2d 319, 321–22 (6th Cir.1984) (per curiam). The *Danielson* rule serves the purpose of increasing the level of certainty as to the tax consequences of contracts. *North American Rayon Corp. v. C.I.R.,* 12 F.3d 583, 587 (6th Cir.1993). "Not only does the *Danielson* rule provide certainty to the Commissioner, it also provides a higher level of certainty to the taxpayers by maintaining "the reasonably predictable tax consequences" of agreements." *North American Rayon Corp. v. C.I.R.,* 12 F.3d 583, 587 (6th Cir.1993), *citing Danielson,* 378 F.2d at 775. The Commissioner is not bound by the form and can look through the form of a taxpayer's transaction to its substance in determining the proper effect for taxation. *North American Rayon Corp.,* 12 F.3d at 587–88, *See also Commissioner v. Court Holding Company,* 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). The *Danielson* rule does however, increase the predictability of tax results by preventing one party to an agreement from unilaterally reforming an agreement for tax purposes. *North American Rayon Corp.,* 12 F.3d at 588.

Hunter claims that the *Danielson* rule is not an "absolute rule of law, and it does not apply under the facts of this case . . ." (Plaintiff's post-trial brief, p. xiii.) In order to examine whether the *Danielson* rule applies in this case, it will be necessary to examine the cases from this Circuit that have made this same inquiry. In *Schatten,* (*Schatten v. United States,* 746 F.2d 319, 321–22 (6th Cir.1984) (per curiam)), a taxpayer argued that payments from her ex-husband should be nontaxable income because in economic reality the payments were for property settlement, even though the divorce settlement agreement specifically stated that she would treat the payments as ordinary income. The Sixth Circuit would not allow the taxpayer to go beyond the terms of her unambiguous agreement. One of the reasons the Sixth Circuit gave for adopting the *Danielson* rule in that case was that "[i]f [the wife] is in effect permitted to alter the tax conse-

quences that she bargained for, then she will have succeeded in unilaterally reforming the agreement to her benefit." *Schatten,* 746 F.2d at 322; *See North American Rayon Corp.,* 12 F.3d at 587–88.

In *Patterson v. Commissioner,* 810 F.2d 562 (6th Cir.1987), the Sixth Circuit refused to apply the *Danielson* rule where the contract terms regarding allocation of purchase price to a noncompete covenant were ambiguous because "[t]he *Danielson* rule can only be meaningfully applied in those cases where a specific amount has been mutually allocated to the covenant as expressed in the contract." *Patterson,* 810 F.2d at 572. In *Green v. Commissioner,* 855 F.2d 289 (6th Cir.1988), the Sixth Circuit refused to apply the *Danielson* rule to a divorce decree that labeled payments as a property settlement because "a court-ordered divorce decree is not the result of the kind of bargaining that enters into the negotiation of a settlement agreement". *Green,* 855 F.2d at 293. Finally, in *North American Rayon Corp. v. C.I.R.,* 12 F.3d 583, 587 (6th Cir.1993), the Sixth Circuit did apply the *Danielson* rule to an asset sales contract, that was not conducted at arms-length between a corporation and its wholly owned subsidiary and that unambiguously allocated a purchase price among the subject assets. The Court held that the taxpayers were bound by the unambiguous allocation of the purchase price set forth in the agreement absent a showing of undue influence rendering the allocation unenforceable.

In this case, the facts of *Patterson,* more closely relate to the transactions that occurred. The only specific number mentioned in the contract regarding the sale price was the premium of $21 Million Dollars. As this court has already determined, that number was only a plug number in the equation. The testimony shows that the parties to this agreement, Hunter and the State of Ohio, did not intend that number to be fixed. Perhaps the most damaging aspect of the Government's case is that it admits that the amount of the premium was not $21 Million as stated in the contract, but instead was between $20.3 and $20.4 Million.[3] In terms of the

---

**3.** Mischell Test., Transcript set 1, p. 156, lines 4–

8; The Government's reference and acceptance

entire deal, $600,000 to $700,000 Dollars may not seem to be an extraordinary amount of money. However, for purposes of the *Danielson* rule the amount is substantial. Under the *Danielson* rule, the number is either $21 Million and the rule applies, or the premium is not $21 Million and the rule does not apply. Further, the testimony elicited from Mr. McAlister, the Superintendent of Savings and Loans for Ohio that the $21 Million dollar figure was "subject to adjustment." (McAlister test., Transcript set 2, p. 111). Mr. McAlister added "That was the final component that was to go into the pot, so to speak, was the so-called premium. And I think everyone that was working closely with it understood that nobody really knew what all the numbers were and that it had to be adjusted." (McAlister test., Transcript set 2, p. 111. lines 9–13.) Mr. McAlister's testimony was consistent on Cross-examination.

> Mr. Sherman: Q. And the contract also reflects the selling price for those intangible assets, doesn't it?
>
> Mr. McAlister: A. Well, you know, as I tried to explain on direct, and I have heard Mr. Quigley talk about a plug number in terms of the premium all morning. And, my view, in terms of that differential number, is that that was the number that it took to fill the hole that I needed to have filled so that the depositors and the debenture holders would get their money. And I knew and everybody else knew that was associated with this transaction, that those underlying numbers were going to change, and when you change one number another number changes, and so forth and so on.

Finally, in a colloquy with the court Mr. McAlister testified that he did not care how the money was allocated as long as the there was a certain figure for distribution. (McAlister test., Transcript set 2, p. 133, lines 8–12.) The government's witness, Mr. Dixon Miller, testified to the same.

of the 20.3 to 20.4 million dollar premium is continuous throughout Mr. Mischell's testimony, and thereafter.

Additionally, in the Government's post-trial brief, Pg. iv, Summary Argument, it states:

The Court: ... Their allocation of what they were paying for that was of no moment to you.

Mr. Miller: That's correct, that's correct. Additionally, there was no unilateral action by Hunter. The State was aware of the actions taken by Hunter and it fully expected Hunter to take those actions. The valuation process was also checked by the Accounting Firm of Ernst & Whitney.

When a valuation is made it reflects the accuracy of those items valued on that day only. Each passing day, the earlier valuation becomes less and less accurate. The day of reckoning for valuation in this case was on the day Hunter actually received physical and actual ownership of Home State, in other words, closing day, June 13, 1985. The testimony of Mr. Mischell regarding how Hunter reached their valuations was persuasive. (Mischell test., Transcript set 2, p. 56–58, lines 2, p. 56 through 14, p. 58.) The schedules provided to the State in July reflecting the values of the Home State assets and liabilities on June 13, 1985 are the schedules that Hunter is bound to, not the schedules Chemical created months earlier. There is no practical difference between a loan, a bond or a pound of gold. All are traded in the marketplace and all fluctuate in value. The parties to this agreement knew this to be the case and knew that the valuations would fluctuate. Prior to June 13, 1985 no specific amount was mutually allocated to any asset. Accordingly, the *Danielson* rule does not apply to the agreement until June 13, 1985. The schedules used at that point put the players in the ball park as to the figures involved but they were not in and of themselves the determining figures. Until June 13, 1985, the actual value of Home State at closing could only be guessed at. The contract was not binding upon the parties until that day. Indeed, the contract itself provided that if the Agreement between the parties was terminated before the closing date, each party would only be liable for its own expenses. (Ex. 7, P. 35). The *Daniel-*

On the first issue, the United States submits that Hunter paid $20.4 million under its contract. . . . .

*son* rule would apply to the document after June 13, 1985, however, the Government sought to apply this rule prematurely. Hunter is in full compliance with the *Danielson* rule post June 13, 1985 because, they correctly figured their tax basis and liabilities based on valuations made at closing.[4]

## CONCLUSIONS OF LAW

A. This Court has jurisdiction pursuant to 28 U.S.C. Section 1346, *et seq.*

B. The allocations to the intangible assets must be made on the basis of the fair market value of those assets on the day they were purchased, namely June 13, 1985. *See Beaver Dam Coal Co. v. United States,* 370 F.2d 414, 417 (6th Cir.1966); *Kaplin v. Commissioner,* 748 F.2d 1109, 1111 (6th Cir.1984) ("[i]n determining the fair market value of property, little evidence could be more probative than the direct sale of the property in question").

C. Hunter could realize a gain upon its receipt of $15.1 Million Dollars from Ameritrust and Star only if Hunter's adjusted tax basis in the intangible assets was less than $15.1 Million. 26 U.S.C. § 1001; Treasury Regs. § 1.1001-1.

D. Hunter's tax basis in the intangible assets of the branches it sold to Ameritrust and Star was represented by the premium those two banks paid which was equal to the cost of that property to Hunter. Accordingly, Hunter did not recognize a gain on its resale to Ameritrust and Star.

E. The *Danielson* rule, *Commissioner v. Danielson,* 378 F.2d 771 (3d Cir.), *cert. denied,* 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967), provides that "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter the construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." *Danielson, supra.* The Sixth Circuit adopted the *Danielson* rule in *Schatten v. United States,* 746 F.2d 319, 321–22 (6th Cir.1984) (per curiam).

F. "The *Danielson* rule can only be meaningfully applied in those cases where a specific amount has been mutually allocated to the covenant as expressed in the contract." *Patterson v. Commissioner,* 810 F.2d 562, 572 (6th Cir.1987).

G. The Hunter and the State of Ohio knew that the valuations in the contract would fluctuate. Prior to June 13, 1985 no specific amount was mutually allocated to any asset. Accordingly, the *Danielson* rule does not apply to the agreement until June 13, 1985 which is the date of closing and the date that Hunter valued the acquired loan portfolio based on the prevailing interest rates.

H. The schedules provided to the State in July reflecting the values of the Home State assets and liabilities on June 13, 1985 are the schedules that Hunter is bound to, not the schedules Chemical created months earlier.

■ I. There is no basis in this case for the imposition of the "substantial understatement" penalty under 26 U.S.C. § 6661. Hunter had "substantial authority" within the meaning of the statute and regulations thereunder for the positions it took with respect to the sales to Ameritrust and Star as well as its loan portfolio valuation.

J. Hunter is entitled to a refund of the tax deficiency assessment it paid in the amount of $118,082 plus the penalty of $29,-521 for substantial understatement, plus in-

---

4. The Government spent a considerable amount of time and relies heavily upon paragraph 13 in the contract between Hunter and the State. Paragraph 13 deals with the repayment to the Superintendent with regard to the credit loss reserve, a wholly distinct and separate issue than the ones in this case. The credit loss reserve was a reserve with an initial deposit of 6 million dollars which was intended to reimburse Hunter for credit losses which it took on the sale and repayment of an asset. For example, if Hunter purchased an asset for $100,000 and subsequent-ly sold the asset for $80,000 then there would be a difference of $20,000, and Hunter, subject to some various provisions in the agreement which restricted that right, but for general purposes Hunter would have the right to access the credit loss reserve for that $20,000 difference. Within paragraph 13 there is also a reciprocal provision for the State of Ohio. In any event, the credit loss reserve comes into play *after* the assets are valued. The assets were not valued officially until June 13, 1985.

terests of $98,119.31 for a total refund of $245,722.31. Hunter, likewise, is entitled to interest on the amount of $245,722.31 from the date that the original request for refund was denied.[5]

LET JUDGMENT ISSUE IN ACCORDANCE WITH THE FOREGOING.

---

**5.** At the conclusion of this trial and after the post-trial briefs were due, the IRS served upon Hunter a notice that the IRS, based on information from the trial, had recomputed the penalty it believed was due from Hunter based upon the alleged substantial underreporting. The IRS originally assessed Hunter $29,521.00. It now seeks to impose a penalty of $637,126.00, an increase of over $600,000. This action by the

IRS is highly questionable and appears to be retaliatory against Hunter for contesting the IRS' original determination. In any event this court has made the legal determination that a penalty for underreporting would not be proper in this case because Hunter relied on substantial authority pursuant to the statutory framework when it filed its original return.