106 T.C. No. 12

UNITED STATES TAX COURT

HIGHLAND FARMS, INC. AND SUBSIDIARY, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6642-93.                    Filed April 17, 1996.


P, an accrual basis taxpayer, operates a
continuing-care residential retirement community that
has five types of accommodations:  cluster homes or
condominiums; apartments; a lodge; a rest home; and a
skilled nursing health-care center.  The rest home and
health-care center are not involved in this case.  The
residents purchase the cluster homes or condominiums
for the full purchase price and pay the taxes,
insurance, and utilities for their unit.  The cluster
home or condominium owner can transfer the unit only to
P which must repurchase the unit at certain percentages
of the original purchase price during the first 7 years
after purchase and thereafter at not less than 76
percent of the original purchase price.  The residents
of the apartments and the lodge must pay a lump-sum
entry fee before taking occupancy and must thereafter
pay a monthly rent.  Except for the first 10 percent,
the entry fees for the apartments are refundable on a
prescribed percentage basis over a 5-year period.
Except for the first 5 percent, the entry fees for the
lodge are refundable on a prescribed percentage basis
over a 20-year period.

Held:  The cluster home or condominium transactions constitute sales rather than financing arrangements so that P must include in income the net gains on the sales and is not entitled to depreciation deductions on the units.

Held further:  The entry fees do not constitute prepaid rent or advance payments for services that must be reported in the year of receipt.  P's reporting of the nonrefundable or nonforfeitable portions of the entry fees each year clearly reflects income.  Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203 (1990); Oak Industries, Inc. v. Commissioner, 96 T.C. 559 (1991) applied.

David M. Furr and John D. Kersh, Jr., for petitioners.

James E. Gray and Paul G. Topolka, for respondent.

PARKER, Judge:  Respondent determined a deficiency in petitioners' Federal income tax in the amount of $2,531,650 and an addition to tax under section 6661 in the amount of $632,913 for the taxable year 1988.[1]

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After respondent's concession,[2] the issues for decision are:

---

[1] Respondent also determined that the deficiency meets the definition of a large corporate underpayment under sec. 6621(c) as in effect for determining interest for periods after Dec. 31, 1990, and, therefore, that the rate of interest on the deficiency will be increased by 2 percent over the usual rate determined under sec. 6621(a)(2).

[2] Respondent no longer asserts an adjustment of $5,001,633 deriving from the cluster home or condominium "liabilities"; that
(continued...)

(1) Whether partially refundable entry fees paid by residents of the apartment and lodge units are includable in income in the year of receipt as advance payments or prepaid rent or are deposits to be reported ratably in accordance with the accrual of nonrefundable or nonforfeitable portions; (2) whether the purchase prices paid by cluster home or condominium purchasers are sales receipts[3] or are loans or financing arrangements; and (3) whether petitioner Highland Farms, Inc. is liable for the addition to tax under section 6661.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Highland Farms, Inc. (petitioner), is a corporation duly organized and existing under the laws of the State of North Carolina. Petitioner's principal place of business was located in Black Mountain, North Carolina, at the time it filed the petition in this case. Petitioner is the parent corporation of its wholly owned subsidiary, Highland Farms Associates, Inc.

---

(...continued)
is, the unrecognized portions of the cluster home or condominium receipts equivalent to the repurchase liabilities. This concession is consistent with respondent's treating the cluster home or condominium transactions as sales. In the notice of deficiency, respondent was, in effect, including both the gross amount of the sales receipts and the gain from the sales.

[3] The resolution of this issue will determine whether petitioner Highland Farms, Inc. is allowed depreciation for the cluster homes and condominiums.

Petitioner operates the Highland Farms Retirement Community (Highland Farms), a continuing-care residential retirement community located in the Swannanoa Valley in western North Carolina, approximately 1 mile west of the town of Black Mountain and approximately 13 miles east of Asheville. During 1988, Highland Farms included five different types of accommodations: cluster homes or condominiums,[4] apartments, a lodge, a rest home, and a health-care center. This full-service community allowed residents to proceed through different levels of independent and/or assisted living accommodations, if they so chose, as their needs changed.

Highland Farms had numerous facilities for leisure activities and hobbies. These facilities included lounges for social functions, a woodworking shop, arts and crafts rooms, a library, a music room, pianos, organs, a greenhouse, vegetable gardens, a billiard room, shuffleboard, horseshoes, croquet, a whirlpool, and a photography darkroom. The recreational facilities were generally available without charge for most Highland Farms residents,[5] but petitioner charged for instruction or materials. Also located on the premises were a beauty salon, a barber shop, and a commissary. Petitioner made available two guest rooms at reasonable rates.

---

[4] All references to cluster homes hereafter will also include condominiums. References to condominiums, however, will be to the condominiums only.

[5] Cluster home residents were charged a monthly fee for the recreational facilities; during 1988, this fee was $15 per occupant, not including materials.

Cluster Homes

Cluster homes featured individually owned units grouped in clusters of four to six units with attached carports. The cluster homes were available with one, two, or three bedrooms. Cluster homes were available for purchase only and required payment of a monthly maintenance fee. In addition, condominium units were available for purchase only and required payment of a monthly maintenance fee. Petitioner reserved the right to increase the maintenance fee effective the first of each calendar year with 30 days' notice to the owners.

Three legal documents were executed in connection with the purchase of a cluster home: a deed, a purchase agreement, and a lease agreement. Petitioner's attorney, Charles Worley, drafted these documents for petitioner's use. All three documents made reference to the other two documents. A copy of the purchase agreement was attached to the recorded deed, and the terms of the purchase agreement were also incorporated into the deed by reference. Pursuant to the deed, petitioner "bargained and sold" and conveyed the cluster home unit in fee simple to the purchaser. The lease agreement was for the surrounding yard; the lease payment was $1 per month. The term of the lease ran "for a term coinciding with [purchaser's] ownership" of the cluster home, terminating upon the "sale or other disposition" by the purchaser of the cluster home. The purchase agreement remained in effect as long as the owner occupied the cluster home.

In the purchase agreement, petitioner agreed to convey and the purchaser agreed to purchase the identified unit. In the

case of an already existing cluster home, the purchase agreement required a deposit of 15 percent of the purchase price upon execution of such agreement and the balance at closing. If the cluster home were to be constructed, the initial deposit was 20 percent of the purchase price upon execution of the agreement, 40 percent within 5 days after notification that the house package had arrived at the construction site, and the balance at closing.

Cluster home owners were responsible for payment of real estate taxes on the cluster home and were billed by Buncombe County individually for those taxes. Cluster home owners were responsible for maintaining homeowners' insurance on their units and were individually billed by their homeowners' insurance company for the same. Cluster home owners were also responsible for payment of their utilities as billed to them individually by the utility companies. Petitioner was responsible for maintaining the lawns, driveways, exteriors of the structures, and major repairs to appliances and their replacement.

In the event of total destruction of the cluster home,[6] the cluster home reverted back to petitioner, and the owner was entitled to keep the proceeds of the insurance policy. If the destruction was only partial, the owner had the option to repair the home or resell it to petitioner in its damaged condition. Under the latter option, the repurchase price would be reduced by the cost of restoring the home.

The purchase agreement placed the following restrictions on

---

[6] Total destruction was defined as destruction of over 70 percent of the cluster home.

the cluster home owners:

(1)  Each cluster home owner was required to abide by the rules and regulations of Highland Farms.

(2)  Each cluster home owner was prohibited from carrying on any noxious or offensive activity in the cluster home or on the grounds of Highland Farms.

(3)  At least one occupant of the cluster home had to be 55 years of age or older; no occupant could be under 18 years of age; and no more than three persons could reside in the cluster home.

(4)  No cluster home owner could lease or assign any rights in the cluster home and the ground surrounding the cluster home without petitioner's express permission.

(5)  No cluster home owner could convey or attempt to convey by deed or otherwise any incident of ownership in and to the cluster home and the grounds surrounding the cluster home without petitioner's express written permission.

(6)  The cluster home owner could not make any structural changes or additions to the cluster home without the written consent of petitioner.

With the exception of the destruction provision, if the owner of a cluster home desired to sell the home or died within the first 7 years of residence, petitioner was obligated to repurchase the cluster home for a certain percentage of the original purchase price according to a schedule in the purchase agreement.  If this occurred within the first 12 months from the date of purchase, the repurchase price was the original price

less 6 percent. Each year thereafter, up to 7 years after the date of sale, the repurchase price was reduced by an additional 3 percent of the original price. Anytime after 7 years, the repurchase price was 76 percent of the original price of the cluster home.

Lease and maintenance fee payments that were in arrears for more than 60 days would accumulate interest at the rate of 9 percent per annum. Such payments were considered liens on the ownership of the cluster homes and were required to be paid in full with interest prior to, or out of, the repurchase monies.

Cluster home owners were required to give 90 days' notice of intent to vacate. Those owners who wished to move into a Highland Farms apartment would receive the appropriate repurchase price, plus a credit towards the apartment's entry fee of 1 percent of the cluster home purchase price per year of cluster home occupancy, up to a maximum of 7 years. Where petitioner allowed structural changes, it required the owners to pay the cost of the addition and amended the original purchase agreement so that the repurchase price would include not less than 76 percent of the cost of the addition.

The cluster home purchasers understood that they were required to transfer the cluster home back to petitioner for a percentage of the original purchase price. Petitioner has always honored its repurchase commitment. Petitioner has not and as a practical matter would not have allowed any cluster home owner to sell the cluster home to a third party, nor would petitioner approve an owner's subletting the unit, even if the potential

purchaser or lessee met the residency requirements of Highland Farms. Up to the time of the trial petitioner had allowed only two transfers of ownership: (1) A cluster home owner married another cluster home owner, the wife transferred title of her unit to herself and her new spouse as tenants by the entireties, and petitioner repurchased the husband's unit; and (2) an owner transferred title of his unit to a grantor trust, subject to the same terms and conditions of the purchase agreement. Up to the time of the trial petitioner had resold each repurchased cluster home for a price higher than its original purchase price.[7]

The parties stipulated that the testimony of the cluster home purchasers would be that the transactions were always represented to the purchasers as sales, and that at no time did petitioner make representations to the purchasers, either in writing or orally, that the transactions were loans or mortgages or that there was a mortgagor-mortgagee or lender-borrower relationship between the parties. Petitioner, however, contends such a relationship is evident in the purchase agreement. The parties also stipulated that it was the cluster home purchasers' understanding that they were required to transfer their cluster homes back to petitioner for a percentage (not less than 76 percent) of the original purchase price. This was also the understanding of petitioner's president, James Neves.

---

[7] Although it had never happened as of the time of the trial, if real estate market prices fell, petitioner would resell the repurchased cluster home for a price less than its original purchase price.

Apartments

Apartments were available in efficiency, one bedroom, or two bedroom units. Each apartment had a private patio or balcony. All apartments had fully equipped kitchens, electric baseboard heating, cable television hookup, and adequate closet space. Each apartment was connected to the fire alarm system and an emergency call system. The apartments were linked by enclosed corridors to all facilities on the premises.

Apartments were available only upon payment of an entry fee and monthly rent pursuant to a rental contract. Petitioner collected the entire entry fee before the resident moved into an apartment; no interest accrued on the entry fee. The monthly rent included the cost of utilities and emergency nursing services. Petitioner reserved the right to revise the monthly rent. The entry fees and monthly rent (exclusive of meals) for the apartments during 1988 were as follows:

| Type of Unit | Entry Fee | Monthly Rent |
|--------------|-----------|--------------|
| Efficiency | $16,000 | $470 |
| One Bedroom | 22,000 | 649 |
| Two Bedrooms | 28,000 | 829 |

Petitioner required the residents of the apartments to dine in the main dining room 25 times per month; a separate charge applied to the meal service. Guests were welcome at meals for a nominal charge. Petitioner charged the apartment residents separately for medical costs and other special services, such as transportation, housekeeping, and laundry.

The rental contract did not specify the length of the agreement. Residents intending to terminate occupancy were required to give 120 days' notice and were obligated to pay the rent for that period even if they vacated the premises prior to the end of the 120-day period, unless a new tenant rented the unit within that time. Residents transferring to the health-care center were required to give only 60 days' notice. Petitioner had the right to evict an apartment resident on demand for failure to keep financial accounts current. If a resident was disruptive, created an undue hazard to himself or others, or failed to abide by the rules and regulations of Highland Farms, petitioner had the right to terminate the rental agreement. Should the resident's physical or mental condition become such that continued occupancy of the apartment would pose a hazard to the resident or others, petitioner, in consultation with its medical staff and the resident's family, would attempt to find suitable accommodation in the lodge, health-care center, or elsewhere. The agreement would terminate in the event of destruction of the building rendering the apartment uninhabitable, except the agreement would not terminate if petitioner opted to repair the building and provided the resident with accommodations during the repair period.

According to the rental contract, the entry fee was deemed to have been earned by petitioner:

Ten (10%) percent at the time the Tenant takes occupancy of the Unit.

Ten (10%) percent during the first year of occupancy,

prorated on a monthly basis.

Twenty (20%) percent during each of the next four (4) years, prorated on a monthly basis.

If a resident terminated the rental contract or died within the first 5 years, petitioner refunded to the resident or the resident's estate the portion of the entry fee deemed unearned. However, petitioner was entitled to offset against this refund any amounts due under the terms of the agreement, such as health-care center charges.

The Lodge

The lodge was a 38-unit residence for those requiring hotel-type services.  It had two-floor elevator service.  The lodge offered four types of accommodations all of which had a private bath:

(1) Single room--residents of these units were required to eat in the main dining room three meals per day.

(2) Studio apartment with combination sink, two-burner range and refrigerator--residents were required to eat in the main dining room at least two meals per day.

(3) Expanded studio apartment with larger kitchen and approximately 50 percent more living space than a regular studio--residents were required to eat in the main dining room at least two meals per day.

(4) One bedroom apartment with fully equipped kitchen, full bath, living/dining room, and bedroom with walk-in closet-- residents were required to eat one meal per day in the main dining room.

Each of the four types of lodge accommodations required payment of an entry fee and monthly rent in accordance with a rental contract. Petitioner could revise the monthly rent with a minimum of 30 days' notice to the lodge residents. Separate payments were made for the meal service, medical costs, and other services. The rental contract did not specify the length of the agreement. The rights to terminate the contract of both petitioner and the resident were similar to those rights under the apartment rental contract.

The entry fees and monthly rent (exclusive of meals) for the lodge units during 1988 were as follows:

| Type of Unit | Entry fee | Monthly Rent |
| --- | --- | --- |
| Single Room | $25,000 | $425 |
| Studio Apartment | 26,500 | 452 |
| Expanded Studio | 35,000 | 632 |
| One Bedroom | 52,000 | 844 |

Petitioner collected the entire entry fee before the resident moved into a lodge unit. If the entry fee was received more than 60 days prior to the date of occupancy, the contract called for petitioner to credit the resident with interest at the rate of 10 percent per annum for the period between the date of deposit and the date of occupancy.

If the prospective resident terminated the contract prior to occupancy, petitioner refunded the entry fee plus any interest, less a discount of 5 percent of the entry fee. If the tenant terminated the contract or died within the first 20 years of

occupancy, refunds would be made in accordance with a schedule attached to the contract, subject to a minimum discount of 5 percent of the entry fee.  Such a schedule is not part of the record; however, after the first 5 percent the first year, the balance of the entry fee is taken into income by petitioner over the next 19 years.

Rest Home

The 30-bed rest home provided 24-hour nursing care in a homelike environment.  Many private rooms allowed residents to use their own furnishings, creating a homelike atmosphere in an institutional setting.  All meals, housekeeping, and laundry services were provided.  The rest home did not charge an entry fee.  There were no adjustments in the notice of deficiency pertaining to the rest home.

Health-Care Center

The health-care center (center) was a 60-bed licensed, skilled nursing facility to serve residents' medical needs and was approved by Medicare, Medicaid, and major insurance carriers. All Highland Farms residents had 24-hour skilled nursing care available to them at a moment's notice.  Nursing care could also be provided within a residence for a limited time with the prior approval of the residence director.  Residents of Highland Farms unable to care for themselves, in a short-term or long-term illness, were given priority for a bed in the center.  The center offered physical, speech, and occupational therapy.  The center's Social Services and Activities Department offered full-time

counseling and therapeutic recreational programs for the center's patients.  The center did not charge an entry fee.  There were no adjustments in the notice of deficiency pertaining to the health-care center.

## Petitioner's History

When petitioner entered into this industry in 1969, most retirement facilities in existence were church-sponsored.  These were primarily life-care programs requiring a large nonrefundable lump-sum payment.

Petitioner was among the first privately owned businesses to enter this field.  A total of 21 individuals contributed $5,000 each to start the company.  When petitioner was preparing to build its cluster homes and apartments, bank financing was not available for retirement communities.  Petitioner viewed the entry fees and the cluster home purchases as a method of financing.

Petitioner filed a Declaration of Condominium (Declaration) with the Office of the Register of Deeds, Buncombe County, North Carolina, on April 3, 1987.  The purpose of the Declaration was to create:

> a condominium development providing for individual ownership of the real property estates consisting of the area of space contained in each dwelling unit in said buildings, and the co-ownership by the individual and separate owners thereof, as tenants in common of all the remaining real property * * *.

In the Declaration, petitioner agreed to divide the subject property into 16 "legally described freehold estates" consisting of the 16 condominium units and one freehold estate consisting of

the common area.  Paragraph 21.5 of the Declaration states,

> Leasing or renting of Unit is not prohibited; provided,
> however, that so long as [petitioner] owns or control
> (sic) the Highland Farms Retirement Complex,
> prospective tenants must first be approved by
> [petitioner] for suitability within the Highland Farms
> Complex, which approval shall not be unreasonably
> withheld.

Petitioner filed an amendment to the Declaration on December 31, 1987, adding more units and area to the condominium.

As of June 27, 1991, the overall average length of occupancy of an apartment unit by a particular resident was 5 years, 2 months.[8]  As of June 27, 1991, the overall average length of occupancy of a lodge unit was 2 years, 4 months.[9]  Petitioner's occupancy data was not analyzed on an individual resident basis. Petitioner opines that if occupancy were calculated on an individual resident basis, the average length of occupancy would have been longer than that by unit, since some residents changed apartments.  The actuarial life expectancies of the lodge residents[10] upon their entry dates ranged from 3.0 years to 15.3 years.  A sample of 15 of the 123 apartment residents exhibited life expectancies at entry ranging from 5.7 years to 15.3 years.[11]

---

[8] The average length of occupancy for each unit was calculated, and then the overall average length of occupancy for all units was calculated.

[9] See supra note 8.

[10] This data was compiled using the residents at the time of the analysis, sometime in mid-1991.

[11] See supra note 10.  This sample was drawn by taking each eighth account beginning with the eighth account.

Petitioner's Financial and Tax Accounting

Since its incorporation on February 25, 1969, petitioner has consistently maintained its books and records, and filed its corporate tax returns, on the accrual method of accounting, using a taxable year ending December 31. Its tax accounting has been consistent with its financial accounting.

On November 28, 1990, the American Institute of Certified Public Accountants (AICPA) released its Statement of Position 90-8 entitled "Financial Accounting and Reporting by Continuing Care Retirement Communities" (SOP 90-8). SOP 90-8 addressed financial accounting standards, not tax accounting standards, providing guidance on applying generally accepted accounting principles to transactions resulting from continuing-care contracts. The provisions of SOP 90-8 were effective for fiscal years beginning on or after December 15, 1990, but accounting changes made so as to conform to SOP 90-8 were to be applied retroactively. Petitioner's accountant, David Worley, reviewed petitioner's accounting methods and found them to be in compliance with SOP 90-8.

In its books, petitioner recorded the entry fees in "Advance deposit" account numbers 261 and 262 for the apartments and the lodge, respectively. The entry fees were not placed in escrow. Petitioner recorded 20 percent of the apartment entry fees as income in the year of receipt, and an additional 20 percent per year for the next 4 years, reducing account 261 accordingly. With respect to the lodge entry fees, petitioner recorded 5 percent as income in the year of receipt and the remainder over

the next 19 years in accordance with the schedule provided to the residents as part of the rental contract, reducing account 262 accordingly. Similarly, for Federal income tax purposes, petitioner reported as income these same portions of the entry fees for the apartments and the lodge as they became nonrefundable or nonforfeitable within that tax year.

As of January 1, 1988, account 261 had a balance of $578,038, and account 262 had a balance of $1,066,982, for a total of $1,645,020. As of December 31, 1988, account 261 had a balance of $628,577, and account 262 a balance of $1,131,830, for a total of $1,760,407. Thus, during 1988, the accounts had net increases of $50,539, and $64,848, respectively, for a total net increase that year of $115,387.

In its books, petitioner recorded 6 percent of the cluster home receipts as income in the year received and credited the remaining 94 percent to an account designated as "Liability for Repurchase". Petitioner's books treated a total of 24 percent of the purchase price as income over a 7-year period, with corresponding reductions in the liability account, as follows: 6 percent in year 1 and 3 percent per year in years 2 through 7. The liability for repurchase account was never reduced below 76 percent of the original purchase price of the cluster home.

For Federal income tax purposes, petitioner did not treat the cluster home transactions as sales. Petitioner reported the proceeds from the cluster home transactions in accordance with that year's reductions in petitioner's "liability for repurchase" amounts. Petitioner also claimed depreciation deductions on the

cluster homes.

Respondent audited petitioner's Federal income tax returns for the taxable years 1974 and 1975. Respondent made no changes to petitioner's method of accounting as a result of that audit.

Petitioner filed its Federal corporate income tax return (Form 1120) for the taxable year 1988, based on the calendar year, using the accrual method of accounting. Since late 1985, accountant David Worley (Worley) has prepared petitioner's returns and financial statements; the accounting firm of Deloitte, Haskins and Sells (DHS) had prepared those returns and financial statements completed prior to that time. Worley's firm reviewed the previous work of DHS, agreed with their preparation, and followed the same method.

In reviewing petitioner's Federal income tax return for the taxable year 1988, respondent determined that petitioner's method of accounting for the entry fees did not clearly reflect income in that the entire amount of the entry fees should have been reported in the year of receipt. Respondent adjusted petitioner's income to include $1,645,020 of unreported entry fees received through December 31, 1987, plus $115,387 of unreported entry fees received for taxable year 1988, for a total adjustment of $1,760,407 related to the entry fees.

Respondent also determined that petitioner's method of accounting for the cluster home transactions did not clearly reflect income in that those transactions should have been accounted for as sales. Respondent increased petitioner's cluster home income by $5,001,633 based on petitioner's stated

cluster home liabilities and by $1,079,098, consisting of cumulative unreported gain on cluster home sales and disallowance of cluster home depreciation claimed through taxable year 1988. Respondent has conceded the $5,001,633 adjustment. See supra note 2.

Respondent recomputed deductions for charitable contributions and net operating losses, calculated the environmental tax and corresponding deduction, and allowed a general business credit carryforward. On January 7, 1993, respondent issued the notice of deficiency with the resultant deficiency in tax in the amount of $2,531,650 and an addition for substantial understatement of income tax under section 6661 in the amount of $632,913.

OPINION

Entry Fees

Respondent argues that the entry fees are prepaid rent and are includable in income in the year of receipt. Petitioner contends the fees are neither rent nor payment for services, characterizing these "deposits" merely as a means of financing the construction of Highland Farms. Petitioner argues that its reporting of income from the entry fees is consistent with its method of keeping its books, and is thus a proper method of accounting.[12] Petitioner also argues that since petitioner has no guarantee it will be allowed to keep the entire amount of any

---

[12] Petitioner also notes that its bookkeeping is in accordance with AICPA's Statement of Position 90-8 entitled "Financial Accounting and Reporting by Continuing Care Retirement Communities", published November 28, 1990.

fee, inclusion in income should be ratable as the fees are "earned".[13]  We agree with petitioner.

Section 446(a) provides that taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes its income in keeping its books.  The accrual method of accounting is one permissible method of computing taxable income.  Sec. 446(c)(2).  Petitioner is an accrual method taxpayer and has kept its books regularly in accordance with this method.

However, financial accounting and income tax accounting methods have divergent objectives.  Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 542-543 (1979).  "Given this diversity, even contrariety, of objectives, any presumptive equivalency between tax and financial accounting would be unacceptable."  Id.  The general rule specifying use of the taxpayer's method of accounting is limited to cases where such method clearly reflects income.  Id. at 541; see American

---

[13] For the first time in its brief, petitioner raised the statute of limitations as a defense, arguing that respondent is precluded from including entry fees and cluster home receipts received during those years now barred by sec. 6501.  The defense of the statute of limitations must be affirmatively pleaded. Rule 39.  It is untimely for petitioner to raise it in its brief, and we need not consider it.  Brown v. Commissioner, 24 T.C. 256, 264 (1955); Rule 34(b)(4) and (5); Rule 41.

Additionally, adjustments in accordance with sec. 481, as these would be if respondent is correct in her position, are not precluded by the statute of limitations.  Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 797 (11th Cir. 1984); Graff Chevrolet Co. v. Campbell, 343 F.2d 568, 571-572 (5th Cir. 1965); W.S. Badcock Corp. v. Commissioner, 59 T.C. 272, 288-289 (1972), revd. on another issue 491 F.2d 1226 (5th Cir. 1974).

Automobile Association v. United States, 367 U.S. 687 (1961).
Petitioner, thus, cannot simply rely on the consistency of its
tax accounting with its bookkeeping as a sufficient basis for
upholding its treatment of income.

In considering the tax treatment of deposits, the Supreme
Court has held:

> Whether these payments constitute income when received,
> however, depends on the parties' rights and obligations
> at the time the payments are made. * * * Whether these
> customer deposits are the economic equivalents of
> advance payments, and therefore taxable upon receipt,
> must be determined by examining the relationship
> between the parties at the time of the deposit.  The
> individual who makes an advance payment retains no
> right to insist upon the return of the funds; so long
> as the recipient fulfills the terms of the bargain, the
> money is its to keep.  The customer who submits a
> deposit to the [taxpayer] * * * retains the right to
> insist upon repayment * * * and the [taxpayer]
> therefore acquires no unfettered "dominion" over the
> money at the time of receipt.

Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203,
211-212 (1990) (emphasis in original).  The taxpayer's
unrestricted use of the funds is not dispositive.  Id. at 209-
210; Oak Industries, Inc. v. Commissioner, 96 T.C. 559, 570
(1991).  Whether the taxpayer pays or accrues interest on the
depositor's behalf is not a controlling factor.  Id. at 571.
"The key is whether the taxpayer has some guarantee that he will
be allowed to keep the money."  Commissioner v. Indianapolis
Power & Light Co., supra at 210.

In Indianapolis Power & Light, the taxpayer required
customers with suspect credit to deposit an amount equal to twice
the customer's estimated monthly utility bill to insure prompt
payment of their bills.  These deposits were refundable upon the

customers' demonstrations of acceptable credit.  The Supreme
Court held that the utility customers' deposits were not advance
payments, since the customers were under no obligation to
purchase goods or services, and the customers' behavior
controlled the amounts of the refunds.  Therefore, the customers'
deposits were not taxable income.

Similarly, in Oak Industries, Inc. v. Commissioner, supra,
the deposits were intended as offsets to any unpaid fees, damages
to equipment, or any other costs to the taxpayer due to a
customer's breach.  The customer who performed according to his
or her obligations had a right to a refund of the deposit.  These
deposits were not taxable income to the taxpayer.

In the instant case, the residents of the apartments and the
lodge, if they decided to move out of their units, had a right to
a refund of a portion of their entry fees in accordance with the
schedules stated in their respective rental contracts.  The
refunds were within the residents' control, and petitioner had
"no unfettered 'dominion' over the money at the time of receipt".
At the time the entry fees were paid, the only amounts petitioner
was guaranteed to be allowed to keep were the nonrefundable
portions.  Thus, we hold that the refundable portions were not
advance payments for services or prepaid rent.[14]  As a result,

---

[14] The parties submitted expert reports that purported to
show the fair market rental value of the units.  Neither expert
was called to testify, the parties having represented to the
Court that their experts had met and reached agreement as to the
fair market rental value of the units.  A joint exhibit embodying
their joint conclusions was prepared and filed with the Court at
the conclusion of the trial.  That joint exhibit is neither clear
(continued...)

petitioner is not required to include the entire amount of the entry fees in income in the year of receipt. Only the nonrefundable or nonforfeitable amounts each year constitute income. Petitioner included in income for a specific taxable year those portions of the entry fees for the apartments and the lodge that became nonrefundable or nonforfeitable within that tax year. This method of accounting for the entry fees clearly reflects income. It was an abuse of discretion for respondent to conclude that the fees must be included in petitioner's income for the year of receipt. We hold for petitioner on this issue.

Cluster Home Transactions

Respondent has treated the cluster home and condominium transactions as sales, requiring the gain from these transactions to be included in income in the year of receipt and disallowing the depreciation deductions petitioner took with respect to these units. Petitioner argues that its obligation to repurchase a cluster home or condominium unit created a security transaction in the nature of a mortgage, not a sale. We agree with respondent.

"Under North Carolina law, the test for determining whether a conveyance with an option to repurchase represents a true sale

---

(...continued)
nor helpful to the Court, and on brief the parties seem unable to agree as to what their experts supposedly agreed to. The Court has disregarded both parties' expert reports and the experts' joint exhibit. After notice petitioner could increase the monthly rental payments for the apartment or lodge units, without regard to the entry fees. The Court rejects respondent's suggestion that the entry fees represent prepaid rent that somehow makes up for supposed below market rental rates.

or merely a loan with a security interest focuses on the intent of the parties and not the form of the transaction." Redic v. Gary H. Watts Realty Co., 762 F.2d 1181, 1185 (4th Cir. 1985) (citing O'Briant v. Lee, 214 N.C. 723, 200 S.E. 865 (1939)). The intention to create a mortgage must be established, not by simple declaration of the parties, but by proof of the facts and circumstances outside the deed which are inconsistent with an absolute purchase. Redic v. Gary H. Watts Realty Co., supra at 1186; O'Briant v. Lee, 214 N.C. at 731, 200 S.E. at 870.

The North Carolina Supreme Court has identified six factors to be considered in determining whether a transaction is a sale or a loan:

> (1) whether there was a debtor-creditor relationship created at the time of the transaction * * *; (2) whether the "grantor" remains in possession or whether the grantee takes immediate possession of the property * * *; (3) whether the "grantor" was under distress and hard-pressed for money at the time of the transaction * * *; (4) whether the transaction originated out of an application for a loan * * *; (5) whether the purported sale price is less than the net worth of the property * * *; and (6) whether the "grantor" was obligated to exercise the "option to repurchase." * * *

Redic v. Gary H. Watts Realty Co., supra at 1186 (citations omitted).

In deciding whether a transaction constitutes a sale for tax purposes, this Court considers whether the burdens and benefits of ownership have passed to the purported purchaser; this is a question of fact to be ascertained from the intentions of the parties as evidenced by the written agreements read in the light of the attending facts and circumstances. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). Factors

considered have included:

> (1) Whether legal title passes * * *; (2) how the parties treat the transaction * * *; (3) whether an equity was acquired in the property * * *; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments * * *; (5) whether the right of possession is vested in the purchaser * * *; (6) which party pays the property taxes * * *; (7) which party bears the risk of loss or damage to the property * * *; and (8) which party receives the profits from the operation and sale of the property * * *.

Id. at 1237-1238 (citations omitted).

The cluster home and condominium transactions arose not out of petitioner's seeking a loan, but out of the purchasers' buying housing units in a retirement community. Petitioner made no representations to the purchasers, either orally or in writing, that the transactions were loans or mortgages. Petitioner agreed to convey in fee simple and the purchasers agreed to purchase the specified cluster home or condominium for the designated purchase price. Legal title passed from petitioner to the purchasers, and the deeds were recorded. The purchasers, then the owners of the cluster homes or condominiums, took possession of their cluster homes or condominiums and paid the property taxes, the fire and liability insurance, and the utility bills for the unit. The owners received the proceeds of the fire and liability insurance in the event of a loss. If an owner did not repair a partially destroyed cluster home or condominium, petitioner would deduct the repair costs from the repurchase price. While the repurchase price of a cluster home or condominium was less than its original sales price, it cannot be said that the original sales price was

less than the full value of the cluster home or condominium.[15]
The purchase agreement required the owners to obtain petitioner's
permission to assign or convey the property; this indicates that
cluster home owners had the right to assign or convey their
cluster homes, although as a practical matter transfers had
occurred in only two instances as of the time of the trial.  The
Declaration of Condominium gave condominium owners the right to
lease or rent their units with petitioner's approval of the
prospective tenant; the Declaration of Condominium also provided
that petitioner could not unreasonably withhold its approval.  On
balance these facts support the conclusion that the transactions
were sales, rather than mortgages.

In the early years of its business, petitioner was unable to
obtain commercial financing for the construction of its
retirement community and was in need of funds.  The accelerated
payment schedule for cluster homes to be built as compared to
those already built supports this.  However, petitioner's
continuing need for funds after constructing the initial units is
not shown by the record in this case.

Petitioner assumed an obligation to repurchase the cluster
home or condominium for a minimum of 76 percent of the original
purchase price when the purchaser died or decided to sell the
unit.  If the unit were totally destroyed by fire or other

---

[15] Petitioner points to the repurchase price in support of
its contention that the transaction is a mortgage.  Petitioner
does not address the nature of the excess of the original price
over the repurchase price, nor the fact that the repurchase price
decreases over 7 years and then remains constant thereafter.

disaster, the cluster home would revert to petitioner without repurchase by petitioner, but the owner received the insurance proceeds. Additionally, petitioner controlled whether it would be obligated to repurchase through its power to grant or deny permission to convey the property. This "obligation" to repurchase was an advantage rather than a disadvantage in that petitioner, by selling the cluster homes itself, reaped the difference between the repurchase amounts and the higher resale prices. Where petitioner repurchased cluster homes and resold them, petitioner received all of the profits; this tends to weigh against the transactions' being sales. However, while the cluster home or condominium owner did not receive the benefit of any appreciation in the fair market value of the unit, the owner was assured of receiving at least 76 percent of the original purchase price. In the event that the real estate market for retirement homes collapsed, petitioner could bear any loss. Thus, petitioner and the owner each had both a benefit and a detriment in the repurchase arrangement. While the cluster home or condominium owner had to forgo the benefit of possible appreciation, he or his estate was assured of receiving at least 76 percent of his original purchase price, an assurance that aging members of a retirement community might find attractive, particularly compared to the usual church-sponsored retirement communities that required large, nonrefundable upfront payments.

Some of the above aspects of this transaction support petitioner's proposed characterization while others support respondent's. Under these circumstances, we believe that the

most significant factor is the characterization of the parties to the transaction in their written agreement.  Both petitioner and the "purchasers" of the properties in question had a significant interest in that characterization.  The "sale" characterization used in the documents for underlying transactions gave the purchasers ownership which was potentially important for purposes of the purchasers' deduction of interest and real estate taxes. If petitioner prevails, those tax benefits, and possibly others, would be jeopardized.  In similar situations, we have required taxpayers who attempt to recharacterize the written terms of a transaction to adduce strong proof that the written contract was without economic substance.  North American Rayon Corp. v. Commissioner, 12 F.3d 583 (6th Cir. 1993), affg. T.C. Memo. 1992-610; Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965); Ullman v. Commissioner, 264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957).  Petitioner has failed to produce such strong proof. Based on all of the above facts and circumstances, we hold that the cluster home or condominium transactions were sales.  In light of this, petitioner had no depreciable interest in the cluster homes or condominiums, and respondent properly disallowed deductions for depreciation.  Weiss v. Wiener, 279 U.S. 333 (1929); Taube v. Commissioner, 88 T.C. 464 (1987).  Petitioner is also taxable on the net gain on the sales transactions.  See supra notes 2, 13.

Section 6661 Addition to Tax

Section 6661 provides for an addition to tax for the

substantial understatement of income tax. A substantial understatement in the case of a corporation is an understatement that exceeds the greater of (1) 10 percent of the tax required to be shown on the return, or (2) $10,000. Sec. 6661(b)(1). If the taxpayer has substantial authority for the tax treatment of the item in question, or if the taxpayer adequately discloses the tax treatment of the item on the return, then the amount of the understatement for purposes of this section will be reduced by that portion of the understatement which is attributable to that item. Sec. 6661(b)(2)(B).

Petitioner made no disclosures on its return, so we need only consider whether substantial authority exists for petitioner's tax treatment of any of the items leading to the understatement. "There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions." Sec. 1.6661-3(b)(1), Income Tax Regs. The substantial authority standard is less stringent than a "more likely than not" standard, but stricter than a reasonable basis standard. Sec. 1.6661-3(a)(2), Income Tax Regs.

As was stated above, the test under North Carolina law for determining whether a conveyance with an option to repurchase represents a true sale or merely a loan with a security interest focuses on the intent of the parties. Redic v. Gary H. Watts Realty Co., 762 F.2d at 1185. This intention must be established by the facts and circumstances. Id. at 1186. Our consideration

of these facts and circumstances led to our conclusion that the cluster home and condominium transactions were sales, as respondent contended. However, some factors supported petitioner's position. Given the peculiarly factual nature of the inquiry, we think that petitioner can be said to have had substantial authority for its treatment of the cluster home and condominium transactions. Therefore, we hold that petitioner is not liable for the addition to tax for substantial understatement.

To reflect the above holdings and respondent's concession,

Decision will be entered

under Rule 155.