# United States Tax Court

T.C. Memo. 2025-127

ANDRE TEMNOROD AND BRIANNA TEMNOROD, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos.  5114-19, 13634-19,       Filed December 8, 2025.
            14053-19, 14462-19,
            14464-19.

————

*Matthew F. Kadish*, *Stephen L. Kadish*, and *Dean M. Rooney*, for petitioners.

*Joseph D. Stewart-Pirone, Maha Sadek, Nancy P. Klingshirn, Dawn L. Danley-Nichols, John D. Davis*, and *Donald Kevin Rogers*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, *Judge*: These cases involve a loss reported by Broadvox, Inc. (Broadvox), an electing small business corporation (S corporation),[2] on its 2012 Form 1120S, U.S. Income Tax Return for

---

[1] Cases of the following petitioners are consolidated herewith: Eugene Blumin and Julia Blumin, Docket No. 13634-19; Alex S. Bederman and Polly V. Bederman, Docket No. 14053-19; Alexander Gertsburg and Inna Gertsburg, Docket No. 14462-19; and Gary Tabachnik and Milana Tabachnik, Docket No. 14464-19.

[2] *See* I.R.C. § 1361. Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

**[*2]** an S Corporation. The loss was in turn reported by Broadvox's shareholders, petitioners here,[3] on their 2012 Forms 1040, U.S. Individual Income Tax Return. As to Broadvox's largest shareholders, portions of the losses were carried back to their 2010 returns.

Broadvox's ownership as of December 31, 2012, was as follows:

| Name | Ownership Percentage[4] |
|---|---|
| Andre Temnorod | 43.662% |
| Eugene Blumin | 21.831% |
| Alex S. Bederman | 21.831% |
| Alexander Gertsburg | 0.603% |
| Gary Tabachnik | 3.722% |

The reported loss at issue in turn stems from transactions related to a 2011 bankruptcy proceeding by Infotelecom, LLC (Infotelecom), a related company, which in turn was wholly owned by Infotelecom Holdings, LLC, an entity in which Mr. Temnorod was a 50% member, Mr. Blumin was a 25% member, and Mr. Bederman was a 25% member.

In connection with Infotelecom's bankruptcy proceedings, Broadvox Holding Co., LLC (BV Holding),[5] an entity wholly owned by Broadvox,[6] purchased substantially all of Infotelecom's assets. Under the terms of an asset purchase agreement and Infotelecom's plan of reorganization, in 2012 BV Holding paid $1,660,754 to Infotelecom and $1,600,000 to Verizon Communications, Inc. (Verizon), and agreed to assume certain delineated liabilities in exchange for all of Infotelecom's assets. Infotelecom used some of the cash it received from the asset purchase agreement and plan of reorganization toward a payment of $1,562,004 to AT&T, Inc. (AT&T). Both Verizon and AT&T had submitted significant claims as creditors in Infotelecom's bankruptcy.

---

[3] More precisely, petitioners are Broadvox's shareholders and their spouses. The spouses were not shareholders.

[4] The ownership percentages do not total 100% because Broadvox had three additional shareholders not parties to this litigation.

[5] Sometime after 2012 the entity name was changed to Brivia Holding Co., LLC.

[6] BV Holding, as a domestic single-member limited liability company (LLC) that did not elect to be classified as a corporation, was a "disregarded entity," which is a business entity "that is disregarded as an entity separate from its owner for Federal income tax purposes." Treas. Reg. § 1.368-2(b)(1)(i)(A).

**[*3]**   On its 2012 Form 1120S, Broadvox reported the $1,600,000 payment BV Holding made to Verizon and $1,562,000 of the $1,660,754 payment to Infotelecom as cost of goods sold.  In total, Broadvox reported a $7,792,736 loss largely stemming from the transactions described above.

The shareholders of Broadvox in turn each received a tax year 2012 Schedule K–1, Shareholder's Share of Income, Deductions, Credits, etc., from Broadvox reporting their shares of the losses.   The Commissioner examined Broadvox's 2012 return and disallowed the increase to cost of goods sold.  The Commissioner determined that these payments should have been capitalized rather than reported as part of the cost of goods sold and accordingly issued Notices of Deficiency to petitioners, who had reported their pro rata shares of Broadvox's 2012 loss on their respective 2012 Forms 1040.  As indicated *supra*, some petitioners carried a portion of the resulting losses back to their 2010 returns.  The resulting deficiencies were as follows:

| Petitioner | Docket No. | Tax Year | Deficiency |
|---|---|---|---|
| Andre & Brianna Temnorod | 5114-19 | 2010 | $499,926 |
| Eugene & Julia Blumin | 13634-19 | 2010 | 249,963 |
| Alex S. & Polly V. Bederman | 14053-19 | 2010 | 254,304 |
| Alexander & Inna Gertsburg | 14462-19 | 2012 | 2,119 |
| Gary & Milana Tabachnik | 14464-19 | 2012 | 41,788 |

For the reasons set forth in this Opinion, we uphold the Commissioner's determination that Broadvox was required to capitalize all the payments that BV Holding made in connection with Infotelecom's bankruptcy.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  We hereby incorporate the parties' Stipulations of Fact and the attached Exhibits.  When petitioners timely filed their respective Petitions, the Temnorods, the Blumins, the Gertsburgs, and the Tabachniks resided in Ohio, while Mr. Bederman resided in Florida and Ms. Bederman resided in New York.  Petitioners' cases were consolidated for trial, briefing, and opinion.

**[*4] I.**     *Telecommunications Businesses*

    A.     *The Early Years*

In the early 2000s Messrs. Temnorod and Blumin helped to pioneer the commercial availability of Voice over Internet Protocol (VoIP) phone calls, which use an internet connection in place of (or in addition to) traditional phone lines. Messrs. Temnorod and Blumin originally carried on their business through an LLC, Broadvox, LLC (BV LLC), formed in 2001.

Messrs. Temnorod and Blumin were motivated to pursue VoIP technology by the high cost of long-distance calls relative to local calls in the early 2000s. They were aware that incumbent local exchange carriers (ILECs), such as AT&T and Verizon, were permitted by the Federal Communications Commission (FCC) to charge relatively high rates for accepting long-distance calls routed through traditional phone lines. However, at the time the FCC had no regulations specifically governing the rates that ILECs could charge for accepting VoIP calls. Therefore, Messrs. Temnorod and Blumin took the position that both local and long-distance VoIP calls, because they were sent through internet connections rather than phone lines, fell into the category of "information services," such that ILECs could not legitimately charge the higher long-distance rates for routing these calls to their recipients.

For BV LLC to service its customers' VoIP call traffic, it was required to route those calls through a competitive local exchange carrier (CLEC) which in turn connected the calls through ILECs.[7] Importantly, only CLECs can enter into interconnection agreements[8] with ILECs, and BV LLC was not a CLEC itself. Thus, BV LLC passed its customers' calls (for a fee) to various CLECs, which in turn would pass the calls to an ILEC when needed. The ILECs' customers were often the intended recipients of calls initiated by BV LLC's customers.

---

[7] CLECs are regulated by the FCC and state public utility commissions, although historically they have been subject to less stringent rate regulations than ILECs have been.

[8] Legal documents referenced in this Opinion refer to an interconnection agreement as an ICA.

**[\*5]**      1.      *Infotelecom*

In or around 2004 Messrs. Temnorod and Blumin decided to form their own CLEC, Infotelecom.[9]  As a CLEC, Infotelecom—unlike BV LLC—could feasibly enter into interconnection agreements with ILECs and thus pass calls directly to them.  Infotelecom was wholly owned by Infotelecom Holdings, LLC,[10] *see supra* p. 2, and treated for federal income tax purposes as a disregarded entity.

2.      *The Broadvox Group*

Messrs. Temnorod and Blumin next reorganized the ownership of BV LLC, forming a holding company, BV Holding, to hold all its membership interests.  BV Holding was in turn wholly owned by a corporation formed in 2005, Brivia Communications Corp., which in 2007 changed its name to Broadvox, Inc. (i.e., Broadvox).  Both BV LLC and BV Holding were thereafter treated as disregarded entities for federal tax purposes. We will sometimes refer to Broadvox, BV Holding, and BV LLC collectively as the Broadvox Group.

B.      *Carrier Service Agreement*

BV LLC and Infotelecom entered into a Carrier Service Agreement (CSA) dated June 1, 2008.  The CSA specified that Infotelecom would accept call traffic from BV LLC's VoIP customers and route the calls to the intended recipients, interconnecting with third parties (including ILECs) as needed.  Section 13 of the CSA provided as follows:

> [BV LLC] shall promptly pay to INFOTELECOM all inter or intrastate access charges, reciprocal compensation, and/or any other charges, surcharges and/or taxes billed to INFOTELECOM by a third party, or remitted by INFOTELECOM to a third party, that are associated with any of [BV LLC's] traffic delivered  or facilities utilized pursuant to this Agreement, including but not limited to any      retroactive      charges      (collectively,      "Additional

---

[9] Infotelecom appears to have been formed on September 15, 2004.

[10] During the years at issue, Infotelecom Holdings, LLC, was taxed as a partnership for federal income tax purposes.  Its amended tax return for tax year 2012, stipulated by the parties, indicated that it began business on April 1, 2002. The parties acknowledged that such return incorrectly lists its legal name as "Infotelecom, LLC," rather than Infotelecom Holdings, LLC.

**[\*6]**    Charges"), and that are not already reflected in the rates charged by INFOTELECOM for the Services rendered pursuant to this Agreement.

From then on, BV LLC routed most of its customers' calls to Infotelecom, rather than relying exclusively (as it had before) on unrelated CLECs.

II.    *ICA Disputes*

In order to carry out its obligations under the CSA, Infotelecom entered into various interconnection agreements with AT&T and Verizon, under which Infotelecom and each of the ILECs agreed to accept certain call traffic from each other, route that traffic to the appropriate recipient, and charge certain rates for those services. Infotelecom maintained that it was receiving and delivering only "information services" with the ILECs, since Infotelecom's call traffic passed through the internet rather than phone lines. However, AT&T and Verizon insisted that the traffic was long-distance services. Therefore, over the course of several years Infotelecom paid AT&T and Verizon less than they believed they were owed under the interconnection agreements, yielding ever-growing "deltas," i.e., payment differentials, subject to dispute. Meanwhile, Infotelecom billed BV LLC at a rate equal to or not substantially above the rate it paid AT&T and Verizon, and Infotelecom never exercised its rights under section 13 of the CSA to pass through the deltas to BV LLC.

The deltas mounted, and in early 2011 AT&T threatened Infotelecom with service disconnection and termination of the interconnection agreements unless Infotelecom immediately escrowed approximately $3 million. AT&T claimed that Infotelecom was obligated to escrow this amount under the terms of the Infotelecom-AT&T interconnection agreement. Infotelecom's first response was to commence proceedings against AT&T in federal court and before several state public utility commissions. However, in October 2011 Infotelecom voluntarily filed for chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Northern District of Ohio. In connection with Infotelecom's bankruptcy, AT&T submitted unsecured creditor claims totaling approximately $10.2 million, and Verizon submitted unsecured creditor claims totaling approximately $13.9 million.

**[*7]** III.   *Bankruptcy Proceedings*

A.   *Preliminary Filings and Agreements*

On February 15, 2012, Infotelecom filed with the bankruptcy court a chapter 11 plan that proposed (among other things) the sale of substantially all of Infotelecom's assets (including the assignment of its interconnection agreements) to BV Holding or the highest bidder (if BV Holding was not the highest bidder).   The proposed asset purchase agreement provided that BV Holding would pay $1 million to Infotelecom and $1 million to Infotelecom's bankruptcy trust.

B.   *AT&T Cure*

On March 22, 2012, the bankruptcy court entered a stipulated order resolving disputed matters between the debtor and the AT&T companies (AT&T stipulated order).   The AT&T stipulated order provided, among other things, that AT&T would settle its unsecured creditor claims in exchange for a payment from Infotelecom of $1,562,004 (AT&T Cure), comprising the release of $650,012 that Infotelecom had already placed in escrow and $911,992 payable on the effective date of Infotelecom's pending chapter 11 plan.   The AT&T stipulated order also provided that upon receipt of the AT&T Cure, AT&T would release Infotelecom and (if BV Holding proved to be the purchaser of Infotelecom's assets) BV LLC "and its affiliates" from all preexisting claims under the interconnection agreements.

C.   *Verizon Cure*

On April 23, 2012, Infotelecom and Verizon filed a motion for entry of a stipulated order that would settle Verizon's claims in the bankruptcy (Verizon stipulated order).   On that same date, BV Holding and Verizon signed a letter stating, in relevant part: "If [BV Holding] is the successful purchaser . . . [BV Holding] shall pay to Verizon cash in the amount of $1,600,000."   The proposed Verizon stipulated order specified, among other things, that the purchaser of Infotelecom's assets (i.e., BV Holding or the highest bidder) "shall pay to Verizon . . . the cash amount set forth in a separate agreement between [BV Holding] and Verizon of even date herewith (the '**Verizon Cure**')."   The proposed order also included a provision ensuring that upon payment of the Verizon Cure, Verizon would release Infotelecom from all preexisting claims under the interconnection agreements.

[*8]    D.    *Asset Purchase Agreement*

On or around April 20, 2012, Infotelecom and BV Holding executed an Asset Purchase Agreement which provided for BV Holding's purchase of substantially all of Infotelecom's assets, subject to (1) bankruptcy court approval of the chapter 11 plan and (2) auction procedures ordered by the bankruptcy court.   The Asset Purchase Agreement also made provision for Infotelecom to assign some or all of its contracts, including its interconnection agreements, to BV Holding. Section 1.10 of the Asset Purchase Agreement discussed "Cure Costs" and defined them to mean "amounts that must be paid and obligations that otherwise must be satisfied . . . in connection with the assumption and/or assignment of the Assigned Contracts."   Section 2.4(a) of the Asset Purchase Agreement specified, in relevant part:

> [Infotelecom] shall pay and discharge and be responsible for all Cure Costs, including those relating to AT&T and its affiliates but specifically excluding any Cure Costs payable in connection with the assumption and assignment of the Verizon ICAs (the "***Verizon Cure***"), and [BV Holding] shall have no liability therefore or otherwise in connection therewith other than in respect of the Verizon Cure.

Section 3.1 of the Asset Purchase Agreement, titled "Purchase Price," provided as follows:

> In consideration of the sale of the Business[11] and Acquired Assets to the Buyer and the Buyer's assumption of the Assumed Liabilities . . . , the purchase price for the Business and the Acquired Assets shall be the aggregate of (collectively, the "***Purchase Price***"):
>
> (a) $1,630,000 (the "***Cash Purchase Price***");
>
> (b) the amount of the Assumed Liabilities (defined below); and
>
> (c) the waiver of the pre-petition general unsecured claim filed by [BV LLC] in the Bankruptcy Case . . . , and any other pre-petition claims held by [BV Holding] or any

---

[11] The Asset Purchase Agreement's recitals define "Business" as "exchanging traffic to and from other carriers."

**[*9]**   of its Affiliates or any insider of [BV Holding] (collectively, the "***Buyer Claims***").

Section 5.1 of the Asset Purchase Agreement defined the "Assumed Liabilities" to include (among other things) all allowed administrative expense claims and priority unsecured claims in Infotelecom's bankruptcy case and the Verizon Cure.

Section 8.1 of the Asset Purchase Agreement provided in relevant part that Infotelecom and BV Holding "acknowledge that under the Bankruptcy Code, this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval through confirmation of a Chapter 11 Plan." Section 12.8 of the Asset Purchase Agreement provided in relevant part that "[t]his Agreement and the exhibits, schedules, and other documents referred to herein constitute the entire agreement of the parties with respect to the subject matter hereof."

Also on April 23, 2012, Infotelecom and its unsecured creditors (including AT&T and Verizon) filed a joint motion for entry of stipulated order resolving disputed matters, which reported (among other things) that the creditors found the asset sale proposed in the chapter 11 plan objectionable and would not voluntarily assent to it absent revisions to its terms.

On May 7, 2012, the bankruptcy court entered a stipulated order in which Infotelecom and its unsecured creditors (including AT&T and Verizon) agreed that Infotelecom and BV Holding would amend their proposed asset purchase agreement in the following manner:

> [BV Holding] shall increase the cash component of its offer to purchase [Infotelecom's] assets by an amount sufficient (a) to cure claims associated with [Infotelecom's] assumption and assignment to [BV Holding] of certain executory contracts, including [Infotelecom's] interconnection agreements with the AT&T Companies and Verizon; (b) to pay allowed administrative expense claims and priority unsecured claims in cash in accordance with the Bankruptcy Code; and (c) to fund in full the Creditor Settlement Payment [of $526,000].

Also on May 7, 2012, Infotelecom filed with the bankruptcy court its second amended chapter 11 plan, which incorporated the Asset Purchase Agreement, as amended. The disclosure statement attached to the plan represented, among other things, that Infotelecom had

**[\*10]** marketed its assets to potential bidders pursuant to the bankruptcy court's auction procedures order. Although 45 potential bidders signed confidentiality agreements to receive due diligence materials, ultimately no bids were received other than BV Holding's.

On May 17, 2012, the bankruptcy court entered the Verizon stipulated order. It specified, among other things, that the purchaser of Infotelecom's assets (i.e., BV Holding or the highest bidder) "shall pay to Verizon . . . the cash amount set forth in a separate agreement between [BV Holding] and Verizon of even date herewith (the '**Verizon Cure**')." The order also required that upon payment of the Verizon Cure, Verizon would release Infotelecom from all preexisting claims under the interconnection agreements.

E. *Confirmation and Closing*

On June 6, 2012, the bankruptcy court issued "Findings of Fact, Conclusions of Law, and Order . . . Confirming [Infotelecom]'s Second Amended Chapter 11 Plan." Many of the bankruptcy court's findings were categorized into one of two sections: "The Sale" and "Compromises and Releases." The bankruptcy court found, among other things, that BV Holding's offer for Infotelecom's assets "is the highest and best offer" and that the consideration specified in the Asset Purchase Agreement "is fair and reasonable and constitutes full, adequate consideration and reasonably equivalent value for the Acquired Assets." The bankruptcy court also held: "Except for the Assumed Liabilities and as expressly provided otherwise in the [Asset Purchase Agreement] and Plan, [BV Holding] shall not have any liability or responsibility for any liability or other obligation of [Infotelecom] arising under or related to the Acquired Assets."

The closing of the Asset Purchase Agreement occurred on June 22, 2012. On that date, BV Holding paid $1,600,000 to Verizon pursuant to the Verizon stipulated order and also paid Infotelecom $1,660,754,[12] comprising the $1,630,000 Cash Purchase Price (as provided by section 3.1(a) of the Asset Purchase Agreement) and, pursuant to sections 3.1(b) and 5.1 of the Asset Purchase Agreement, $30,754 for unsecured creditor claims allowed in the bankruptcy case (not including those of AT&T and Verizon). The AT&T stipulated order required funding of $1,562,004 as follows: cash payment of $912,004 and release of a

---

[12] Most of the Infotelecom payments were made by wire transfer from BV Holding directly to the bank accounts of Infotelecom's creditors with the message line reading "Infotelecom."

**[\*11]** Prepetition Escrow ($150,000) and a Post Petition Escrow ($500,000); the ultimate payment consisted of a wire transfer from BV Holding to AT&T of $911,992 plus a released escrow amount of $650,012 ($911,992 + $650,012 = $1,562,004). Throughout this Opinion, we refer to the amounts that BV Holding ultimately paid as the "Asset Purchase Agreement Payments."

On or after the Asset Purchase Agreement closing, and pursuant to the Asset Purchase Agreement, Infotelecom assigned some or all of its interconnection agreements to BV Holding, including interconnection agreements with AT&T and Verizon.

IV.     *Tax Reporting and Notices of Deficiency*

On its 2012 Form 1120S, Broadvox included $1,562,000 of the Cash Purchase Price (roughly equal to the AT&T Cure) and the $1,600,000 Verizon Cure, a total of $3,162,000, as cost of goods sold. Overall, Broadvox reported a loss of $7,792,736 for its 2012 tax year. Petitioners accordingly reported their pro rata shares of Broadvox's loss on their respective original and amended 2012 Forms 1040. *See* I.R.C. § 1366(a)(1) (directing S corporation shareholders to take into account their pro rata shares of, among other items, the corporation's loss for the tax year). In 2016 Infotelecom Holdings, LLC, amended its 2012 return[13] explaining that "the return has been amended to properly classify proceeds from the sale of goodwill of $3,162,000 inadvertently recorded as gross receipts." A corresponding amendment was not made to the Broadvox 2012 return. The Temnorods, the Blumins, and the Bedermans amended their returns to reflect the Infotelecom Holdings, LLC, amendment. The Temnorods, the Blumins, and the Bedermans claimed net operating loss carrybacks of their respective shares of Broadvox's reported 2012 loss to their 2010 tax years, while the Gertsburgs and the Tabachniks still had positive gross income for 2012 after taking into account their respective shares of Broadvox's reported loss.[14]

The Commissioner examined Broadvox's 2012 tax return and disallowed the inclusion of any of the Asset Purchase Agreement

---

[13] See the 2012 Form 1065X, Amended Return or Administrative Adjustment Request (AAR), at Exhibit 32-J.

[14] In March 2014 Broadvox filed an amended 2012 Form 1120S, which reported an overall loss of $7,150,867 but which again included the $1,600,000 Verizon Cure and $1,562,000 of the AT&T Cure as cost of goods sold. No further amendments were filed.

**[\*12]** Payments in cost of goods sold. The Commissioner then examined the 2012 tax returns of all petitioners and the 2010 tax returns of the Temnorods, the Blumins, and the Bedermans. The Commissioner disallowed petitioners' reported shares of the portion of Broadvox's reported 2012 loss attributable to the inclusion of $3,162,000 of the Asset Purchase Agreement Payments in cost of goods sold, and he determined computational adjustments for each petitioner flowing from his partial loss disallowances. The issue for determination in these cases (from which petitioners' respective tax liabilities will follow) is whether $3,162,000 of the Asset Purchase Agreement Payments were a cost of goods sold, a deductible business expense, or a capitalizable asset.

OPINION

I.     *Burden of Proof*

Generally, the Commissioner's determinations in a Notice of Deficiency are presumed correct, and the taxpayer bears the burden of proving them erroneous. *See* Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The burden of proof for a particular factual issue may shift to the Commissioner if the taxpayer introduces credible evidence on that issue and complies with substantiation and recordkeeping requirements. *See* I.R.C. § 7491(a). Petitioners do not contend that the burden of proof rests with the Commissioner.

II.     *Cost of Goods Sold, Business Deductions, and Capitalization*

Because the Commissioner disallowed the exclusions of the Asset Purchase Agreement Payments at issue in these cases on the basis that they were not costs of goods sold, we briefly discuss the difference between the exclusion from gross receipts of cost of goods sold and the deduction of business expenses, particularly as it relates to service providers such as the Broadvox Group. Cost of goods sold is not a deduction but rather a subtraction from gross receipts in determining a taxpayer's gross income. *See Beatty v. Commissioner*, 106 T.C. 268, 273 (1996); Treas. Reg. § 1.61-3(a) ("In a manufacturing, merchandising, or mining business, 'gross income' means the total sales, less the cost of goods sold, plus any income from investments and from incidental or outside operations or sources."). In contrast, section 162(a) allows a deduction from gross income for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Important here is that service providers incur deductible business expenses in the provision of their services, but they

**[*13]** are not manufacturing an item with cost of goods incurred in producing the item. *See Guy F. Atkinson Co. of Cal. v. Commissioner*, 82 T.C. 275, 298 (1984) ("[W]here a business is engaged primarily in the providing of service, rather than mining, manufacturing, or merchandising, the business gross receipts will constitute gross income [without any reduction for cost of goods sold]."), *aff'd*, 814 F.2d 1388 (9th Cir. 1987); *Hahn v. Commissioner*, 30 T.C. 195, 198 (1958) (holding that amounts claimed by a blacksmith-welding business as cost of goods sold were claimed improperly, since the business was selling "not a material product" but rather "services"), *aff'd per curiam*, 271 F.2d 739 (5th Cir. 1959).

As noted above, section 162(a) allows a deduction for ordinary and necessary business expenses. In contrast, section 263(a)(1) generally forbids a deduction for "[a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." The principal difference between classifying a payment as a deductible expense under section 162 or a capital expenditure under section 263 concerns the timing of the taxpayer's recovery of the cost. As the Supreme Court has observed:

> The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery: While business expenses are currently deductible, a capital expenditure usually is amortized and depreciated over the life of the relevant asset, or, where no specific asset or useful life can be ascertained, is deducted upon dissolution of the enterprise. . . . Through provisions such as these, the Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes.

*INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 83–84 (1992).

There is a priority given to capitalization because income tax deductions are a matter of legislative grace, with taxpayers bearing the burden of proving entitlement to claimed deductions. *See id.* at 84. Business-related expenditures for which a deduction is forbidden by section 263 generally may be added to the property's basis (i.e., capitalized) and depreciated or amortized in future tax years as noted above. *See also* I.R.C. §§ 167(a), 1016(a)(1).

**[\*14]** Section 161 provides that in computing taxable income, "there shall be allowed as deductions the items specified in this [part VI of subchapter B of chapter 1 of subtitle A of the Code, which includes section 162], subject to the exceptions provided in part IX (sec. 261 and following . . . [which includes section 263])." Coordinately, section 261 provides that "[i]n computing taxable income no deduction shall in any case be allowed in respect of the items specified in this [part IX of subchapter B of chapter 1 of subtitle A of the Code]." The Supreme Court has interpreted these two "priority-ordering directive[s]" to mean that "an expenditure incurred in acquiring capital assets must be capitalized even when the expenditure otherwise might be deemed deductible under Part VI." *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 17 (1974) (requiring the taxpayer to capitalize equipment depreciation incurred during construction of capital facilities under section 263(a)(1), notwithstanding the deduction for depreciation provided by section 167(a)); *see also INDOPCO, Inc. v. Commissioner*, 503 U.S. at 84 ("The notion that deductions are exceptions to the norm of capitalization finds support in various aspects of the Code. Deductions are specifically enumerated and thus are subject to disallowance in favor of capitalization.").

Our Court has interpreted the Supreme Court's various precedents on capitalization to require that an expenditure be capitalized "when it (1) [c]reates or enhances a separate and distinct asset, *see Commissioner v. Lincoln Sav. & Loan Assoc.*, 403 U.S. 345, 354 (1971), (2) produces a significant future benefit, *see INDOPCO, Inc. v. Commissioner*, [503 U.S.] at 87–89, or (3) is incurred 'in connection with' the acquisition of a capital asset, *see Commissioner v. Idaho Power Co.*, 418 U.S. [at 13]." *Lychuk v. Commissioner*, 116 T.C. 374, 385–86 (2001). The phrase "in connection with" in the third situation means that the expenditure was directly related to the acquisition of an asset. *Id.* at 386. Moreover, the Supreme Court gave us further guidance in *Woodward v. Commissioner*, 397 U.S. 572, 577 (1970), indicating that an acquisition-related expenditure is a capital expenditure when its origin "is in the process of acquisition itself." Accordingly, we apply a "process of acquisition test," under which we consider not simply whether an expenditure was somehow related to an asset acquisition, but rather whether the expenditure was *directly* related to that acquisition. *Lychuck*, 116 T.C. at 391.

Thus, expenditures that a buyer must capitalize into an acquired asset's basis are not limited to the price paid to the seller but also include, for example, legal, brokerage, accounting, appraisal, and other

**[\*15]** ancillary expenses directly related to the asset's acquisition. *Id.* at 389 (citing *Woodward v. Commissioner*, 379 U.S. at 576–77). "The requirement that costs be capitalized extends beyond the price payable to the seller to include any costs incurred by the buyer in connection with the purchase, such as appraisals of the property or the costs of meeting any conditions of the sale." *Am. Stores Co. & Subs. v. Commissioner*, 114 T.C. 458, 469 (2000) (quoting *Ellis Banking Corp. v. Commissioner*, 688 F.2d 1376, 1379 (11th Cir. 1982), *aff'g in part, remanding in part* T.C. Memo. 1981-123). They also include liabilities assumed. *David R. Webb Co. v. Commissioner*, 77 T.C. 1134, 1137–38 (1981), *aff'd*, 708 F.2d 1254 (7th Cir. 1983). As we stated in *David R. Webb Co.*, 77 T.C. at 1137:

> It is well settled that the payment of an obligation of a preceding owner of property by the person acquiring such property, whether or not such obligation was fixed, contingent, or even known at the time such property was acquired, is not an ordinary and necessary business expense. Rather, *when paid*, such payment is a capital expenditure which becomes part of the cost basis of the acquired property. Such is the result irrespective of what would have been the tax character of the payment to the prior owner.

III.    *The Parties' Legal Positions*

A.    *Petitioners' Argument*

As indicated above, petitioners agree that Broadvox was a service provider. In their Opening Brief they state that "the very essence of Broadvox's business [was] providing telecommunications services." Despite this position, they continue to maintain the argument that the Asset Purchase Agreement Payments at issue here were for "cost of sales" implying they were equivalent to cost of goods sold. They make a much stronger case that those expenses were otherwise ordinary or necessary business expenses.

They maintain that $3,162,000 of the Asset Purchase Agreement Payments were cost of goods sold because they were inextricably linked to Broadvox's trade or business and represented payments for "previously purchased services" without explaining how such costs were incurred in producing goods or selling an item held for sale.

**[*16]** Petitioners alternatively assert that the Asset Purchase Agreement Payments at issue here are ordinary and necessary business expenses. They maintain that the Broadvox Group paid or incurred a total of $5,438,048 (including assumed liabilities) under the terms of the Asset Purchase Agreement but that only $2,276,048 of this amount was consideration for Infotelecom's assets. Petitioners maintain that the remaining $3,162,000 (viz., the Verizon Cure plus the portion of the Cash Purchase Price roughly equal to the AT&T Cure) was paid in settlement of the Broadvox Group's potential liability to Verizon and AT&T. Petitioners' theory is that, absent the chapter 11 plan and the related bankruptcy settlements, Verizon and AT&T likely would have pursued the Broadvox Group for satisfaction of their claims for the deltas under the interconnection agreements with Infotelecom. Under petitioners' theory, $3,162,000 of the Asset Purchase Agreement Payments was paid to forestall Verizon and AT&T from either suing to hold the Broadvox Group directly liable for Infotelecom's alleged debts or seeking to convert Infotelecom's chapter 11 bankruptcy to a chapter 7 proceeding, in which case a bankruptcy trustee would be appointed and might pursue Infotelecom's rights under section 13 of the CSA (which entitled Infotelecom to demand payment from BV LLC for amounts charged to Infotelecom by third parties in connection with call traffic initiated by BV LLC). According to petitioners, $3,162,000 of the Asset Purchase Agreement Payments need not be capitalized into Broadvox's basis in Infotelecom's assets, since that amount was paid to resolve liabilities of the Broadvox Group, not to purchase assets.[15] In other words petitioners assert that such expenses were deductible under section 162.

### B.  *The Commissioner's Argument*

The Commissioner counters petitioners' theory in part by pointing to section 3.1 of the Asset Purchase Agreement, which provided that "the purchase price for the Business and the Acquired Assets shall

---

[15] Petitioners likewise argue that some of the assets purchased by BV Holding had no value (i.e., the interconnection agreements); they rely on testimony by their expert, Carey Roesel, who testified that by law an ILEC must offer to any CLEC any terms in an existing interconnection agreement to which the ILEC is party, and thus the interconnection agreements generally are not bought or sold in the telecommunications industry. *Cf.* 47 U.S.C. § 252(i) ("A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement."). But this still does not account for goodwill or other intangibles purchased.

**[\*17]** be the aggregate of" the Cash Purchase Price, the Assumed Liabilities (including the Verizon Cure), and the Broadvox Group's waiver of its unsecured claims against Infotelecom.[16] The Commissioner relies on both the "*Danielson* rule" and the "strong proof rule," which are discussed in more detail below, to hold petitioners to the tax consequences of the agreements that were signed in connection with Infotelecom's bankruptcy. The Commissioner stresses the increased administrative burden that would result from allowing taxpayers to escape the form of their self-structured transactions whenever they could save tax by so doing. *N. Am. Rayon Corp. v. Commissioner*, 12 F.3d 583, 587–88 (6th Cir. 1993), *aff'g* T.C. Memo. 1992-610.

The Commissioner likewise puts forward an assortment of additional arguments. He contends that a buyer's intent and motivation in acquiring assets are irrelevant when determining whether the expenses related to the acquisition are capitalizable or deductible, citing *Arkansas Best Corp. v. Commissioner*, 485 U.S. 212, 223 (1988), and *Mitchell v. Commissioner*, 73 F.3d 628, 631 (6th Cir. 1996), *aff'g* T.C. Memo. 1994-237. For example, the cost of acquiring certain intangibles—such as a customer list, goodwill, or going-concern value—is specifically required to be capitalized. Treas. Reg. § 1.263(a)-4(c). The Commissioner further argues that any liabilities assumed by the Broadvox Group in connection with the acquisition of Infotelecom's assets must be capitalized. Finally, the Commissioner alludes to a discrepancy between (1) the purchase price allocation in Broadvox's and Infotelecom Holdings, LLC's original 2012 federal tax returns (which did not report all of the Asset Purchase Agreement Payments on Form 8594, Asset Acquisition Statement Under Section 1060) and (2) the reporting in Broadvox's 2012 financial statements (which reported slightly higher acquired asset values and liabilities assumed than the amounts reported on the tax returns).[17]

---

[16] The Commissioner further points out that (1) the Asset Purchase Agreement contains an integration clause (section 12.8), (2) the bankruptcy court, in confirming the second amended chapter 11 plan, found the Purchase Price to constitute "full, adequate consideration and reasonably equivalent value for the Acquired Assets," and (3) both the Bill of Sale between Infotelecom and BV Holding and an Assigned Contracts List filed with the bankruptcy court characterize the Asset Purchase Agreement Payments as being made for the acquisition of the assets of Infotelecom.

[17] However, the notes to such financial statements made clear that "the assets acquired and liabilities assumed were carried over and recorded at [Infotelecom's]

**[\*18]** IV.     *Legal Analysis*

Addressing cost of goods sold first, it is clear from the record that the Broadvox Group was in the business of providing telecommunication services to customers, and not in the business of creating or selling any material products. And as noted above, cost of goods sold is linked to mining, manufacturing, or merchandising products and not applicable in services industries. *See Guy F. Atkinson Co. of Cal.*, 82 T.C. at 298. Thus, we cannot make the leap that petitioners seem to request, that Broadvox is entitled to a reduction in gross income for cost of goods sold.

Next, we address the form of the transaction and its implications. As the Commissioner noted, when a taxpayer signs a contract unambiguously specifying the consideration for a purchase or purchases, the taxpayer generally is bound by that specification for tax purposes, absent extraordinary circumstances. This is commonly referred to as the "*Danielson* rule," which states as follows: "[A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967), *vacating and remanding* 44 T.C. 549 (1965); *see also Peterson v. Commissioner*, 827 F.3d 968, 987 (11th Cir. 2016), *aff'g in part, dismissing in part* T.C. Memo. 2013-271; *N. Am. Rayon Corp. v. Commissioner*, 12 F.3d at 587.

Further, according to the "strong proof rule," which some courts employ instead of the *Danielson* rule: "[W]hen the parties to a transaction . . . have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration." *Ullman v. Commissioner*, 264 F.2d 305, 308 (2d Cir. 1959), *aff'g* 29 T.C. 129 (1957). In *Major v. Commissioner*, 76 T.C. 239, 247 (1981), our Court formulated the strong proof rule as follows: "[W]here one alleges that an allocation is actually other than that contained in a contract, that party must prove it beyond a mere preponderance of the evidence—he must present

---

respective book values." Further, the notes indicate that the $3,162,000 payments to "two major telecommunications providers in connection with the [Asset Purchase Agreement]" were for "back service charges for services provided by Infotelecom to BV LLC in prior periods."

**[\*19]** 'strong proof' that that allocation [he proposes] is correct based on the intent of the parties and the economic realities."

In general, taxpayers are bound by the form of the transaction that they chose. *Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974).

Petitioners argue that neither the *Danielson* rule nor the strong proof rule can apply to section 3.1 of the Asset Purchase Agreement because, according to them, it does not unambiguously allocate the Purchase Price among the various elements of Infotelecom's consideration. Petitioners emphasize the portions of the Asset Purchase Agreement that discuss liability relief and the parties' ability to continue to do business post bankruptcy.

We agree that there are limits to the *Danielson* and strong proof rules, in cases where there is some ambiguity in the allocations of payments under contract. *See Patterson v. Commissioner*, 810 F.2d 562, 572 (6th Cir. 1987) ("The *Danielson* rule can only be meaningfully applied in those cases where a specific amount has been mutually allocated to the covenant as expressed in the contract."), *aff'g* T.C. Memo. 1985-53; *Peterson Mach. Tool, Inc. v. Commissioner*, 79 T.C. 72, 82 (1982) (holding the strong proof rule inapplicable when the relevant allocation terms of the contract were ambiguous; instead, the taxpayers needed to prove their preferred interpretations by only a preponderance of the evidence), *aff'd*, Nos. 82-2544, et al., 1984 U.S. App. LEXIS 23960 (10th Cir. Apr. 2, 1984). However here we find no ambiguity. Petitioners make much of the fact that no allocation of the purchase price was made to the liability release for BV Holding, yet that liability was primarily Infotelecom's.

Petitioners have not provided proof that the Asset Purchase Agreement was the result of mistake, undue influence, fraud, or duress which would allow us to ignore its provisions stating that the payments at issue were for acquisition of Infotelecom's assets. In fact, the bankruptcy court stated as much in confirming the second amended chapter 11 plan, in which it found that the Purchase Price constituted "full, adequate consideration and reasonably equivalent value for the Acquired Assets." Thus, petitioners have not proven that the Asset Purchase Agreement was unenforceable (which is a prerequisite of the *Danielson* rule). As well, under the strong proof rule, the allocation was not ambiguous and was thoroughly vetted by the bankruptcy court and other creditors. Petitioners' situation is similar to that of the taxpayers

[*20] in *G.C. Services Corp. v. Commissioner*, 73 T.C. 406, 411–12 (1979), where our Court held there was an unambiguous allocation of the entire purchase price to the asset purchased despite the fact that the contract also provided for mutual release from liability to all parties.

Finally, even if we were to accept some ambiguity in the purchase price allocation, we are still compelled to accept the Commissioner's argument that Broadvox was required to capitalize the full amount of the Asset Purchase Agreement Payments because of those payments' relationship to resolving Infotelecom's liabilities and acquiring Infotelecom's assets. Importantly, if petitioners are correct that a payment by BV Holding to resolve the Broadvox Group's potential liabilities to Verizon and AT&T might give rise to a deduction under section 162, we must still inquire further.[18] Even if $3,162,000 of the Asset Purchase Agreement Payments resolved the Broadvox Group's potential liabilities to Verizon and AT&T,[19] that portion primarily resolved Infotelecom's liabilities to Verizon and AT&T. As well, BV Holding's payments to resolve Infotelecom's liabilities to Verizon and AT&T were directly related to its acquisition of Infotelecom's assets. Absent other considerations, those payments must be capitalized. *See Lychuk*, 116 T.C. at 386. If a payment falls under both a deduction provision and a capitalization provision, the capitalization provision prevails. *See* I.R.C. §§ 161, 261; *Commissioner v. Idaho Power Co.*, 418 U.S. at 17. Therefore, Broadvox was required to capitalize the entirety of the Asset Purchase Agreement Payments.

We emphasize that the Verizon Cure and the AT&T Cure were negotiated between Infotelecom and Verizon and AT&T, respectively, in settlement of their disputes over the interconnection agreement deltas.

---

[18] Petitioners posit that the tax status (deductible vs. capitalizable) of such a payment is determined by the "origin of the claim" doctrine. *See United States v. Gilmore*, 372 U.S. 39, 49 (1963) ("[T]he origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was 'business' or 'personal' and hence whether it is deductible or not . . . ."); *Woodward v. Commissioner*, 397 U.S. at 578–79 (extending the test announced in *Gilmore* to the issue of whether a litigation-related payment made in the course of business is deductible or instead must be capitalized). Here the origin of the claim was Infotelecom's liability assumed by BV Holding in the asset acquisition.

[19] The Commissioner points out that petitioners have failed to show what portion of the deltas under the AT&T and the Verizon interconnection agreements was attributable to BV LLC traffic as opposed to traffic originated by Infotelecom's other customers. However, we will assume for the sake of argument that 100% of the deltas was attributable to BV LLC traffic, as petitioners contend.

**[\*21]** The record is clear that the portions of the Asset Purchase Agreement Payments that funded the Verizon Cure and the AT&T Cure were allocable to the resolution of Infotelecom's liabilities under the interconnection agreements, even if they were also allocable to the resolution of the Broadvox Group's *potential liabilities* under section 13 of the CSA or general principles of corporate law. Indeed, the Broadvox Group's potential liabilities to Verizon and AT&T were wholly derivative of Infotelecom's liabilities.

We can readily conclude from the record that all components of the Asset Purchase Agreement Payments were not merely somehow related but were *directly* related to the acquisition of Infotelecom's assets. *See Lychuk*, 116 T.C. at 391. In particular, the Verizon stipulated order and section 5.1 of the Asset Purchase Agreement (which included the Verizon Cure among the Assumed Liabilities) made payment of the Verizon Cure an explicit condition of BV Holding's acquisition of Infotelecom's assets. Likewise, the April 23, 2012, joint motion filed by Infotelecom and its unsecured creditors makes clear that BV Holding's payment to Infotelecom of an amount sufficient to fully fund the AT&T Cure (among other claims) was a de facto condition of the asset sale (since otherwise Infotelecom's creditors would not have consented to the sale). Finally, the 2012 amended tax return reporting by Infotelecom, through Infotelecom Holdings, LLC, as flowing through to and likewise reported by the majority shareholders, makes clear that the $3,162,000 payment was for the sale of goodwill, correspondingly an asset acquisition requiring capitalization by the acquiring entity.[20]

Therefore, we conclude that the payments BV Holding made to resolve Infotelecom's liabilities to Verizon and AT&T are capitalizable. *See id.* (finding the costs directly related to an asset acquisition must be capitalized); *Am. Stores Co.*, 114 T.C. at 469 (finding the costs of meeting the condition of a sale generally must be capitalized); *David R. Webb Co.*, 77 T.C. at 1137 ("[T]he payment of an obligation of a preceding owner of property by the person acquiring such property . . . is a capital expenditure which becomes part of the cost basis of the acquired property.").

Further, even if $3,162,000 of the Asset Purchase Agreement Payments resolved the Broadvox Group's own potential liabilities and

---

[20] Petitioners take issue with the Infotelecom amendment saying it was "a protective measure"; however, that amendment was not filed indicating it as a protective claim, Broadvox did not make a similar protective filing, and the affected shareholders amended their returns, benefiting from the inconsistent reporting.

**[\*22]** therefore, absent other considerations, would give rise to a deduction under section 162, under section 263 this same portion of the Asset Purchase Agreement Payments is capitalizable because it is properly allocable to the resolution of Infotelecom's liabilities, and that resolution was directly related to the asset sale. Since section 263 takes precedence over section 162, *see* I.R.C. §§ 161, 261; *Commissioner v. Idaho Power Co.*, 418 U.S. at 17, Broadvox was required to capitalize the entirety of BV Holding's payments to Infotelecom and Verizon. Broadvox was not entitled to reduce its 2012 taxable income by $3,162,000 of the Asset Purchase Agreement Payments nor treat them as cost of goods sold.

We have considered all the arguments made by the parties and, to the extent not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decisions will be entered for respondent.*